

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JAN 3 0 2020
CHIEF JUSTICE

This opinion was
filed for record
at 8 am on Jan 30, 2020

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 96709-1 |
| Petitioner, | ) | |
| v. | ) | EN BANC |
| CRISTIAN DELBOSQUE | ) | |
| Respondent. | ) | Filed: JAN 3 0 2020 |

YU, J. — We have continually recognized that children are different from adults for the purpose of sentencing. We also recognize that trial judges face an extraordinarily difficult task when determining whether a child's crime is a reflection of transient immaturity or permanent incorrigibility. This case requires us to elaborate on how that determination is made in the context of *Miller*-fix[1] resentencing.

---

[1] The Washington Legislature enacted the *Miller*-fix statutes, RCW 10.95.030 and 10.95.035, in response to the United States Supreme Court's ruling that mandatory life without parole sentences for juveniles are unconstitutional. *See Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

In 1994, 17-year-old Cristian J. Delbosque was convicted of aggravated first degree murder and received a mandatory life sentence without the possibility of release. Because he was a juvenile at the time of his offense, Delbosque was resentenced in 2016 in accordance with the *Miller*-fix statute and received a minimum term of 48 years without the possibility of parole. The Court of Appeals concluded that Delbosque could seek review of his sentence only through a personal restraint petition (PRP), rather than direct appeal, but nevertheless reversed his sentence, holding that the trial court's factual findings were not supported by substantial evidence.

We affirm the Court of Appeals' holding that the sentencing court's findings were not supported by substantial evidence, thus remanding for resentencing was proper. However, we reverse the Court of Appeals' holding that Delbosque was not entitled to a direct appeal. We therefore affirm in part, reverse in part, and remand for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

A.   The crime and original sentence

On October 18, 1993, after a period of heavy drinking, 17-year-old Delbosque brutally murdered Filiberto Sandoval and Kristina Berg. When questioned by police, Delbosque waived his rights and confessed to the murders, although he testified at trial that his girlfriend was the one responsible.

2

A jury found Delbosque guilty of aggravated first degree murder for the death of Berg and second degree felony murder for the death of Sandoval. Delbosque was sentenced to mandatory life without the possibility of parole for Berg's murder.[2]

B.      2016 *Miller*-fix hearing

The Washington Legislature enacted the *Miller*-fix statute in response to the United States Supreme Court's decision in *Miller*, 567 U.S. 460. *Miller* held the Eighth Amendment's ban on cruel and unusual punishment prohibits mandatory life without parole sentences for juveniles and requires sentencing judges to consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480; U.S. CONST. amend. VIII. The *Miller*-fix amended several RCW chapters relating to juvenile sentencing; however, this case involves only provisions concerning unlawful mandatory life without parole sentences for aggravated first degree murder. RCW 10.95.035(1) provides that juveniles who received such sentences prior to June 1, 2014 "shall be returned to the sentencing court or the sentencing court's successor for sentencing consistent with RCW 10.95.030." Delbosque was a juvenile eligible to be resentenced.

---

[2] Delbosque's felony murder conviction was later vacated in accordance with *In re Personal Restraint of Andress*, 147 Wn.2d 602, 56 P.3d 981 (2002).

3

Between June and November 2016, the superior court held a four-day evidentiary hearing pursuant to the *Miller*-fix statute. Both sides presented several witnesses who testified about the crime, about Delbosque's life experience leading up to the murders, and about his behavior as an adult. In its oral ruling, the trial sentenced Delbosque to a minimum term of 48 years without the possibility of release.

1.    Evidence presented

The State presented testimony from the officer who investigated the crime, the juvenile court officer who interviewed Delbosque for his decline determination, and the unit supervisor of the prison where Delbosque was incarcerated at the time of his resentencing. While incarcerated, Delbosque received prison infractions for fighting without a weapon; for extortion; and for possession of a weapon, tattoo paraphernalia, and another inmate's property. Between the ages of 29 and 32, he was repeatedly investigated for gang-related violence. His last infraction occurred in 2010, alleging that Delbosque used his position in a gang to arrange an assault on another inmate. None of the infractions were referred for prosecution. The corrections officer also testified that but for Delbosque's life sentence and immigration detainer, he would be classified as a minimum security prisoner. Six victim impact statements were offered by Berg's family members.

Delbosque's siblings testified about his childhood experiences of growing up in extreme poverty and losing his mother as a young child. In addition, Delbosque confided during his psychiatric evaluations that he was physically and sexually abused by multiple family members.

Two experts testified in support of Delbosque. Dr. Manuel Saint Martin testified about Delbosque's current psychological state and low propensity for future dangerousness. He also concluded that Delbosque was likely experiencing alcohol-induced psychosis at the time of the crime. Dr. Sarah Heavin opined that Delbosque's executive functioning deficits were likely greater than the average 17-year-old because of his early childhood traumas. This in turn would have negatively impacted his development and ability to regulate his behavior.

2. Judgment and sentence

Following closing argument, the superior court judge issued a lengthy oral decision setting Delbosque's minimum term at 48 years. In arriving at this sentence, the court explained,

> The Court recognizes that this sentence may be considered a de facto life without the possibility of parole sentence. However in reaching this conclusion, the Court considered the factors required by RCW 10.95.030(3)(b) and the Miller factors required for consideration of a life without the possibility of parole sentence, and finds that the crime committed by Mr. [Delbosque] is one of those rare cases where a life without the possibility of parole sentence would be appropriate, except for the potential reduction of risk caused by advancing old age.

4 Verbatim Report of Proceedings (VRP) (Nov. 23, 2016) at 662.

5

The court then entered an order incorporating a supplemental written memorandum opinion that set forth the court's findings and conclusions.

C.     Appeal and review

Delbosque directly appealed, and the Court of Appeals unanimously reversed in a published opinion. *State v. Delbosque*, 6 Wn. App. 2d 407, 430 P.3d 1153 (2018). The court held that "the proper method for Delbosque to seek review of the superior court's order is a PRP," but it decided to "disregard this procedural defect and review Delbosque's appeal as a PRP." *Id.* at 413-14.

On the merits, the court held that "(1) the superior court's findings regarding Delbosque having an attitude toward others reflective of the underlying crime and of Delbosque's permanent incorrigibility and irretrievable depravity are not supported by substantial evidence and (2) the superior court failed to comply with the *Miller*-fix statute when setting the minimum term." *Id.* at 414. The court therefore determined that Delbosque's restraint is unlawful, granted his PRP, and remanded for resentencing. *Id.* at 421.

The State filed a petition for review challenging the Court of Appeals' decision on the merits. Delbosque sought review of the Court of Appeals' decision to treat his appeal as a PRP. We granted review of both issues.

ISSUES

6

A.     Were the superior court's findings supported by substantial evidence in the record?

B.     If the findings were not supported by substantial evidence, is the appropriate remedy to remand for resentencing to give the trial court the benefit of our subsequent decisions?

C.     Does RCW 10.95.035(3), which requires parties seeking review of a minimum term sentence imposed pursuant to the *Miller*-fix statute to file a PRP, violate the right to appeal in criminal cases guaranteed by article I, section 22 of the Washington Constitution?

## ANALYSIS

A.     The Court of Appeals was correct in its review of the trial court's findings

Three provisions of the *Miller*-fix statute govern Delbosque's resentencing. First, RCW 10.95.035(1) provides that juveniles who received such sentences prior to June 1, 2014 "shall be returned to the sentencing court or the sentencing court's successor for sentencing consistent with RCW 10.95.030." Second, RCW 10.95.030(3)(a)(ii) gives 16- to 18-year-old juvenile homicide offenders a chance to become eligible for parole by requiring that they receive "a maximum term of life imprisonment and a minimum term of total confinement of no less than twenty-five years." Third, RCW 10.95.030(3)(b) provides:

> In setting a minimum term, the court must take into account mitigating factors that account for the diminished culpability of youth as provided

in *Miller v. Alabama*, 132 S.Ct. 2455 (2012) including, but not limited to, the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated.

We will reverse a sentencing court's decision only if we find "'a clear abuse of discretion or misapplication of the law.'" *State v. Blair*, 191 Wn.2d 155, 159, 421 P.3d 937 (2018) (quoting *State v. Porter*, 133 Wn.2d 177, 181, 942 P.2d 974 (1997)). A trial court abuses its discretion when "its decision 'is manifestly unreasonable or based upon untenable grounds.'" *State v. Lamb*, 175 Wn.2d 121, 127, 285 P.3d 27 (2012) (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). Further, "[t]he 'untenable grounds' basis applies 'if the factual findings are unsupported by the record.'" *Id.* (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)).

Here, the State contends that the Court of Appeals erred when it held that two of the superior court's findings were not supported by substantial evidence. We review findings of fact for substantial evidence. *State v. Dobbs*, 180 Wn.2d 1, 10, 320 P.3d 705 (2014). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). We affirm that the Court of Appeals properly held that substantial evidence did not support the following findings: (1) that Delbosque continues to exhibit an attitude toward others that is reflective of the underlying murder where he chooses to

8

advance his own needs over others and (2) that the crime was not symptomatic of transient immaturity, but has proven over time to be a reflection of irreparable corruption, permanent incorrigibility, and irretrievable depravity. Accordingly, we hold that the trial court abused its discretion, reverse Delbosque's sentence, and remand for resentencing.

1.  Substantial evidence does not support the finding that Delbosque continues to exhibit an ongoing attitude toward others that is reflective of Berg's murder

The trial court cited three factors in support of this finding: the nature of the crime, Delbosque's attempt at trial to implicate his girlfriend in Berg's murder, and his institutional record. With respect to this third factor, the trial court focused on an infraction Delbosque received in 2010 for allegedly arranging an assault on another inmate. Delbosque was 34 at the time.

As the Court of Appeals pointed out, "the court's only example of this attitude was Delbosque's 2010 infraction for attempting to arrange an assault, which occurred six years prior to the evidentiary hearing." *Delbosque*, 6 Wn. App. 2d at 418. In other words, two of the court's three examples of an *ongoing pattern* of predatory behavior relate back to the crime and prosecution, which occurred over 20 years *before* Delbosque was resentenced. The Court of Appeals thus determined that "to whatever extent Delbosque's infraction history does exhibit a

9

pattern related to the murder he committed, that pattern is not continuing or current." *Id.*

Furthermore, while discussing Delbosque's 2010 infraction as evidence of an ongoing attitude reflective of the murder, the sentencing judge declared that "[t]here is no identified program or treatment presented to deal with this negative attribute." 4 VRP (Nov. 23, 2016) at 660. But this overlooks the fact that certain programs, such as substance abuse treatment and anger management programs, were not available to Delbosque because they are reserved only for people with release dates. Moreover, Delbosque "demonstrated a desire to engage in programming that's not available to him as someone who's classified as a life without possibility of parole inmate," and he actually took advantage of those opportunities when available.[3] 3 VRP (Nov. 1, 2016) at 490.

Because the trial court's "only example" of an ongoing attitude reflective of the murder is Delbosque's 2010 infraction, the Court of Appeals correctly determined that there is insufficient evidence to support this finding. *Delbosque*, 6 Wn. App. 2d at 418.

2. Substantial evidence does not support the finding that Delbosque's crime was a reflection of "irreparable corruption, permanent incorrigibility, and irretrievable depravity"

---

[3] For example, Delbosque took a parenting class, despite not being a parent, because "he wanted to understand how his parents had influenced his development." 3 VRP (Nov. 1, 2016) at 519.

In its oral decision, the trial court analyzed whether Delbosque's crime was "a reflection of transient immaturity associated with youth, or something more heinous, often characterized by words such as irreparable corruption, permanent incorrigibility, irretrievable depravity, such that rehabilitation is impossible, making life without parole justified." 4 VRP (Nov. 23, 2016) at 655. This analysis "consider[ed] the actual crime, as well as the life and actions of [Delbosque] after he committed the crime." *Id.* Yet the primary evidence for this finding was, as with the prior finding, based on the crime, Delbosque's attempt to implicate his girlfriend, and his 2010 infraction. Accordingly, the Court of Appeals properly determined that "Delbosque's infraction is not evidence of irreparable corruption proven over time. Delbosque had been in prison for approximately 15 years before the 2010 infraction, and the infraction took place 6 years before the evidentiary hearing." *Delbosque*, 6 Wn. App. 2d at 418.

The Court of Appeals further considered that the trial court "failed to address the greater prospects for reform from a crime committed while Delbosque was a child. . . . The court's rationale is also inconsistent with *Miller*'s recognition that incorrigibility is inconsistent with youth." *Id.* at 420. This reasoning is consistent with our case law indicating that irreparable corruption should be rare. *State v. Bassett*, 192 Wn.2d 67, 89, 428 P.3d 343 (2018). Indeed, *Bassett*'s

11

prohibition on juvenile life without parole sets a high standard for concluding that a juvenile is permanently incorrigible.

Furthermore, the trial court's oral ruling oversimplified and sometimes disregarded Delbosque's mitigation evidence. For example, the Court of Appeals considered the following testimony from Dr. Heavin, who evaluated whether youth was a factor in Delbosque's case: "'[Y]outhfulness, combined with trauma, made him less likely to monitor his own behavior responsibly, inhibit aggressive behavior,'" and "'his relative risk taking was greater than a typically developing youth without those same risk factors.'" *Delbosque*, 6 Wn. App. 2d at 411. Yet the trial court recharacterized Dr. Heavin's conclusions by stating that "these risk factors had the *potential* for a significant impact on [Delbosque's] ability as a juvenile to appropriately respond to his surroundings and appreciate the ramifications of his actions." 4 VRP (Nov. 23, 2016) at 645 (emphasis added). In fact, Dr. Heavin asserted that "lack of good decision making was a cumulative effect of the various traumas he'd experienced, the poverty he'd experienced, his lack of education, his lack of relative social support and his alcohol dependence." 3 VRP (Nov. 1, 2016) at 510. In other words, Dr. Heavin did not testify that Delbosque's life experiences merely had the *potential* to have a negative impact on his decisions, but that they *actually did* have such an impact. The court also

minimized expert testimony about Delbosque's alcohol addiction at the time of the crime and how alcohol uniquely impacts the developing teenage brain.

Similarly, the oral ruling does little to acknowledge Delbosque's mitigation evidence demonstrating his capacity for change. The Court of Appeals highlighted testimony that Delbosque "would qualify for minimum security except for the term of his sentence and an immigration detainer." *Delbosque*, 6 Wn. App. 2d at 410. In addition, Dr. Saint Martin testified that Delbosque's relatively few infractions over a 23-year period, coupled with his progressive decrease in security level, were proof that he was not irreparable and in fact could safely be released. He further opined that Delbosque's risk for future dangerousness would be low. This evidence, however, was not addressed in the trial court's analysis.

These examples suggest that the trial judge did not adequately consider mitigation evidence that would support a finding of diminished culpability, rather than irretrievable depravity. *Miller* hearings require sentencing courts to meaningfully consider "mitigating factors that account for the diminished culpability of youth," including "the youth's chances of becoming rehabilitated." RCW 10.95.030(3)(b). Moreover, the trial court concluded that Delbosque is irretrievably depraved without reconciling, much less acknowledging, significant evidence to the contrary. We therefore affirm the Court of Appeals' conclusion that substantial evidence does not support a finding of permanent incorrigibility.

B.    Given the lack of substantial evidence, we remand for resentencing to give the trial court the benefit of our subsequent decisions

After Delbosque's 2016 resentencing hearing, this court decided two cases that significantly altered juvenile sentencing in Washington. The first was *State v. Ramos*, 187 Wn.2d 420, 387 P.3d 650 (2017). There, we outlined considerations that trial courts must take into account when conducting a *Miller* hearing. *Bassett* followed shortly thereafter, categorically eliminating juvenile life without parole. *Bassett*, 192 Wn.2d at 91. In light of these cases, a remand for resentencing is appropriate so the superior court may have the benefit of recent, relevant precedent when resentencing Delbosque.

1.    The trial court did not have the benefit of *Ramos* or *Bassett* to guide its decision

Delbosque's resentencing hearing occurred in 2016, before this court decided either *Ramos* or *Bassett*. Although neither case directly applied RCW 10.95.035, both discuss issues that are highly relevant to what is required when setting a minimum term pursuant to the *Miller*-fix statute. Much of their analysis therefore applies to this case and to *Miller* hearings pursuant to RCW 10.95.030.

First, *Ramos* clarified that courts "must *meaningfully* consider how juveniles are different from adults, how those differences apply to the facts of the case, and whether those facts present the uncommon situation where a life-without-parole sentence for a juvenile homicide offender is constitutionally permissible." *Ramos,*

14

187 Wn.2d at 434-35 (emphasis added). This means a court "must do far more than simply recite the differences between juveniles and adults and make conclusory statements that the offender has not shown an exceptional downward sentence is justified." *Id.* at 443. Instead, the court must "receive and consider relevant mitigation evidence bearing on the circumstances of the offense and the culpability of the offender, including both expert and lay testimony as appropriate." *Id.*

Predicting a juvenile's future dangerousness is extremely difficult. As the United States Supreme Court has acknowledged, "The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Roper v. Simmons*, 543 U.S. 551, 570, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). *Miller* further attests that "a child's character is not as 'well formed' as an adult's; his traits are 'less fixed.'" *Miller*, 567 U.S. at 471 (quoting *Roper*, 543 U.S. at 570). For this reason, resentencing courts must consider the measure of rehabilitation that has occurred since a youth was originally sentenced to life without parole.

Indeed, other courts have also continued to refine their review of *Miller* hearings in this regard. For instance, the Ninth Circuit Court of Appeals recently remanded a *Miller* resentence to the district court based on the "district court's

heavy emphasis on the nature of [the defendant's] crime, coupled with [the defendant's] evidence that his is not one of those rare and uncommon cases for which LWOP [life without parole] is a constitutionally acceptable sentence." *United States v. Briones*, 929 F.3d 1057, 1067 (9th Cir. 2019). In clarifying what is required in a *Miller* hearing, the Ninth Circuit declared that sentencing courts "must reorient the sentencing analysis to a forward-looking assessment of the defendant's capacity for change or propensity for incorrigibility, rather than a backward-focused review of the defendant's criminal history." *Id.* at 1066. "The key question is whether the defendant is capable of change. If subsequent events effectively show that the defendant *has* changed or *is* capable of changing, LWOP is not an option." *Id.* at 1067 (citation omitted). These observations are highly relevant in light of the evidence Delbosque presented at his resentencing hearing.

Next, *Bassett* held that RCW 10.95.030(3)(a)(ii) is unconstitutional to the extent that it allows any juvenile to be sentenced to life without parole. *Bassett*, 192 Wn.2d at 91. Consequently, every judge conducting a *Miller* sentencing in Washington *must* set a minimum term that is less than life. In *Ramos*, we stated that a "standard range consecutive sentencing may, and in this case did, result in a total prison term exceeding the average human life-span—that is, a de facto life sentence." *Ramos*, 187 Wn.2d at 434. However, we did not define "de facto life sentence" as a "total prison term exceeding the average human life-span." *Id.*

16

Rather, we explicitly stated, "It is undisputed that Ramos' 85-year aggregate sentence is a de facto life sentence, so the question of precisely how long a potential sentence must be in order to trigger *Miller*'s requirements is not before us. *We reserve ruling on that question until we have a case in which it is squarely presented.*" *Id.* at 439 n.6 (emphasis added). Although the trial court clearly intended to impose a life sentence when setting Delbosque's 48-year minimum term, the question of whether this amounts to a de facto life sentence is not squarely presented here, either. We therefore decline to address the issue.

In sum, *Bassett* has narrowed the available sentences under the *Miller*-fix statute, while *Ramos* and other courts have clarified what a meaningful consideration of youth requires in terms of procedure. The superior court would benefit from such precedent in making its resentencing decision.

2.   The Court of Appeals rightly did not allocate a burden of proof or treat age as a per se mitigating factor

The State contends that a remand for resentencing is nevertheless inappropriate for two reasons. First, the State asserts that the Court of Appeals "misallocat[ed] the burden of proof and persuasion" when it "seemed to allocate the burden of proof on the State." Mot. for Review at 6. Contrary to the State's

position, the Court of Appeals properly did not assign a burden of proof to either the State or Delbosque when reviewing the trial court's decision.[4]

The State's argument is grounded in its incorrect belief that Delbosque "bears the burden of proving that his crime was the result of transient immaturity."[5] *Id.* at 5 (citing *Ramos*, 187 Wn.2d at 434-37). The State misinterprets *Ramos*. There, we held that in the context of the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, a juvenile bears the burden of proving by a preponderance of evidence that an exceptional sentence below the standard range is justified. *Ramos*, 187 Wn.2d at 435. This reasoning does not extend to sentencing hearings pursuant to the *Miller*-fix statute, which unlike the SRA, does not impose a burden of proof on either party. Indeed, the trial court rightly stated that although *Miller* and RCW 10.95.030(3)(b) "provide factors and guidelines for the court to consider during the resentencing hearing . . . they do not establish any presumptions to be created or rebutted by any party." Clerk's Papers (CP) at 238. We agree with the

---

[4] Amici in support of Delbosque propose that "[t]he State must have the burden to prove by clear and convincing evidence that the child is incorrigible to justify a minimum sentence over 25 years." Br. of Fred T. Korematsu Ctr. for Law & Equality et al. as Amici Curiae at 13. We appreciate amici's thoughtful consideration of the appropriate burden of proof and understand the desire for a clear benchmark. However, the statute is silent and thus does not provide for such a result.

[5] The State's briefing is inconsistent on this point. While its petition for review argues that Delbosque has the burden of proving his crime was the result of transient immaturity, its response to the joint amici brief supporting Delbosque recognizes that "RCW 10.95.030 does not allocate or define the burden of proof applicable at a *Miller*-fix hearing." Br. of Pet'r in Resp. to Br. of Amici Curiae at 14.

trial court that the statute does not allocate a burden of proof, and we decline to write one in.

The State further asserts that the Court of Appeals "treat[ed] age as a per se mitigating factor," going so far as to characterize the opinion as "say[ing] that all children, all the time, no matter the conduct and irrespective of the facts of the crime, are entitled to a mitigated sentence." Mot. for Review at 6. Far from this, the Court of Appeals merely emphasized the central tenets of *Graham*[6] and *Miller*: Children are "'less deserving of the most severe punishments' . . . and their traits are less likely to be evidence of irretrievable depravity." *Delbosque*, 6 Wn. App. 2d at 419 (internal quotation marks omitted) (quoting *Miller*, 567 U.S. at 471).

Thus, the State's arguments that the Court of Appeals misallocated the burden of proof and improperly treated age as a per se mitigating factor are not supported by the record or the law. In addition, our cases decided after Delbosque's resentencing provide significant guidance on the standards that sentencing courts should apply at *Miller* hearings. We therefore hold that the Court of Appeals correctly reversed Delbosque's sentence and remanded for a new *Miller* hearing.

C.    The Court of Appeals incorrectly held that Delbosque may seek review of his resentence only by PRP, in violation of article I, section 22

---

[6] *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

We now consider whether RCW 10.95.035(3) violates article I, section 22 of the Washington Constitution. Article I, section 22 of the Washington Constitution provides, "In criminal prosecutions the accused shall have . . . the right to appeal in all cases." Meanwhile, RCW 10.95.035(3) provides, "The court's order setting a minimum term is subject to review to the same extent as a minimum term decision by the parole board before July 1, 1986." We review a statute's constitutionality de novo and presume that the statute is constitutional. *Bassett*, 192 Wn.2d at 77. To prevail, Delbosque must show the statute is unconstitutional beyond a reasonable doubt. *Id.*

Parole board decisions setting minimum terms before July 1, 1986 were reviewed by PRP, thus the Court of Appeals determined that Delbosque's appeal was improper and treated it as a PRP. *Delbosque*, 6 Wn. App. 2d at 413-14. Delbosque argued to the Court of Appeals that allowing review only by PRP violates article I, section 22, but the Court of Appeals declined to consider his argument, concluding that he raised it too late. *Id.* at 413 n.3. We exercise our discretion to reach the merits of Delbosque's argument because it is an important constitutional issue that is likely to recur.

With few exceptions, our case law is clear that criminal defendants have the right to appeal sentences and to correct legal errors and abuses of discretion. Whether Delbosque has a right to appeal turns on whether the *Miller*-fix remedy

20

provides only for an amended sentence or requires an actual resentencing. The plain language of RCW 10.95.035(3) and Washington precedent suggest that a *Miller* hearing results in a new, appealable sentence. We therefore reverse the Court of Appeals on this issue and hold that RCW 10.95.035(3) violates article I, section 22 of the Washington Constitution.

1.    Washington law broadly guarantees the right to appeal sentences, even after resentencing

As a general rule, the Washington Constitution guarantees criminal defendants the right to appeal "in all cases." CONST. art. I, § 22. There are limited exceptions to this rule; specifically, standard range sentences pursuant to the SRA are not appealable. RCW 9.94A.585(1). This provision of the SRA does not violate the constitutional right to appeal because "[w]hen the sentence given is within the presumptive sentence range then as a matter of law there can be no abuse of discretion." *State v. Ammons*, 105 Wn.2d 175, 183, 713 P.2d 719, 718 P.2d 796 (1986).

However, even RCW 9.94A.585(1) "does not bar a party's right to challenge the underlying legal conclusions and determinations by which a court comes to apply a particular sentencing provision." *State v. Williams*, 149 Wn.2d 143, 147, 65 P.3d 1214 (2003). Indeed, "appellate review is still available for the correction of legal errors or abuses of discretion in the determination of what sentence

applies." *Id.* Thus, even where a statute appears to broadly prohibit any direct appeal, certain appeals must be allowed pursuant to article I, section 22.

In the context of resentencing, the right to appeal may depend on the nature and scope of the errors in the original sentence. The Court of Appeals has held that

> [r]emand to correct a scrivener's error does not result in a new final judgment and sentence and, accordingly, the court's action to correct the error is not appealable as a matter of right. But remand for resentencing renders the prior judgment and sentence void and results in a new final judgment, which is appealable as a matter of right.

*State v. Amos*, 147 Wn. App. 217, 224 n.1, 195 P.3d 564 (2008) (citations omitted). Our cases likewise recognize that remand and resentencing means that a defendant's "entire sentence [is] reversed, or vacated . . . the finality of the judgment is destroyed." *State v. Harrison*, 148 Wn.2d 550, 562, 61 P.3d 1104 (2003) (finding collateral estoppel did not apply because the defendant's prior sentence "ceased to be a final judgment on the merits").

Thus, to determine whether there is a constitutional right to directly appeal from a sentence imposed pursuant to the *Miller*-fix statute, we must consider whether the statute requires only an amendment of the original sentence or the entry of an entirely new sentence.

2. The *Miller*-fix statute requires resentencing to remedy erroneous mandatory life without parole sentences

The very purpose of the *Miller*-fix statute is to correct unconstitutional mandatory life without parole sentences in accordance with *Miller. In re Pers.*

*Restraint of McNeil*, 181 Wn.2d 582, 590, 334 P.3d 548 (2014) ("The *Miller* fix remedies the unlawfulness of the petitioners' sentences by providing they must be resentenced in a manner that does not violate the Eighth Amendment, consistent with *Miller*."). When an apparently legal sentence is later held unconstitutional, as here, the remedy is to "remand[] to the superior court, with instructions to *resentence* appellants in accordance with law." *State v. Lindsey*, 194 Wash. 129, 130, 77 P.2d 596 (1938) (emphasis added); *see also State v. Mehlhorn*, 195 Wash. 690, 692-93, 82 P.2d 158 (1938). Such resentencing is subject to direct appeal.

*Lindsey* and *Mehlhorn* illustrate how we have long treated resentences as appealable. Both cases concerned an ex post facto law overturned by the United States Supreme Court. *Lindsey*, 194 Wash. at 130; *Mehlhorn*, 195 Wash. at 691. The invalid sentences did not "'necessitate the granting of a new trial, or vacation of the verdict found,'" but rather served as "'a ground for reversing the erroneous judgment or sentence, leaving the verdict to stand as a basis for a new and proper sentence.'" *Lindsey*, 194 Wash. at 131 (quoting 8 RULING CASE LAW *Criminal Law* § 237, at 237 (1915)). *Mehlhorn* further explained that the erroneous sentence was "void as to offenses committed prior to its enactment" and thus required resentencing. *Mehlhorn*, 195 Wash. at 691. In both instances, the defendants directly appealed their resentencing decisions.

23

Resentencing in accordance with the *Miller*-fix statute is consistent with the resentencing at issue in *Lindsey* and *Mehlhorn*. In both situations, the defendant was given a sentence that was later held unconstitutional, and in both situations the defendant was given a new, appealable sentence. The *Miller*-fix statute itself describes the process as "resentencing" that, like the resentencing in *Lindsey*, does not require a new trial on the defendant's underlying conviction. RCW 10.95.035(4) ("A resentencing under this section shall not reopen the defendant's conviction to challenges that would otherwise be barred by RCW 10.73.090, 10.73.100, 10.73.140, or other procedural barriers."). Thus, like the defendants in *Lindsey* and *Mehlhorn*, individuals sentenced pursuant to the *Miller*-fix statute are constitutionally entitled to direct appeal.

Nevertheless, because the *Miller*-fix statute provides that sentences will be "subject to review to the same extent as a minimum term decision by the parole board before July 1, 1986," one might presume that the two situations are similar. RCW 10.95.035(3). This is not the case. Sentences imposed pursuant to the *Miller*-fix statute are procedurally and constitutionally distinct from minimum term sentences set by the parole board before July 1, 1986.

The imposition of a minimum term sentence prior to July 1, 1986 occurred in an administrative setting where the parole board "relie[d] on standardized guidelines and inform[ed] an inmate of the reasons for his or her minimum term

24

when outside the guideline range." *In re Pers. Restraint of Sinka*, 92 Wn.2d 555, 565-66, 599 P.2d 1275 (1979). Consequently, this court determined that "the setting of a minimum term is not part of a criminal prosecution and the full panoply of rights due a defendant in such a proceeding does not apply to a minimum term setting." *Id.* at 566.

A resentencing pursuant to the *Miller*-fix statute is entirely different. Unlike a parole board hearing, a *Miller* hearing is adversarial, involves arguments from both the defendant and the State, and mandates that a sentencing judge consider specific criteria that account for the diminished culpability of youth. These differences demand more stringent due process protections than the "minimal due process" at stake in a minimum term hearing before the parole board. *Id.* at 556. Whereas review by PRP is appropriate for a minimum term sentence imposed by the parole board, the same cannot be said for a sentence pursuant to *Miller*.

Thus, both the procedures involved and the statutory language itself strongly indicate that the *Miller*-fix statute requires the trial court to vacate the erroneous life without parole sentence and impose a new minimum term consistent with the statutory criteria. Such resentencing necessarily results in a new, appealable sentence.[7]

---

[7] The trial judge proceeded as though this was the case, explaining in his memorandum opinion that "[t]he Order and Judgment will reflect . . . that the sentence set forth . . . will be

3. A PRP is not a substitute for appeal

It is essential to preserve the right to appeal in criminal cases because a PRP does not, and is not meant to, afford the same protections as an appeal. *See In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 824, 650 P.3d 1103 (1982). On appeal, the standard of review is more favorable to criminal defendants, as the State has the burden to prove beyond a reasonable doubt that a constitutional error is harmless. *Id.* at 825. In contrast, a personal restraint petitioner claiming a constitutional violation must establish that they were actually and substantially prejudiced. *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 884-85, 952 P.2d 116 (1998).

The State contends that review of a *Miller* resentencing will not be subject to this heightened standard because "the petitioner will have 'had no previous or alternative avenue for obtaining state judicial review' in such cases." Second Suppl. Br. of Pet'r at 3 (quoting *In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 149, 866 P.2d 8 (1994)). However, the State's reliance on *Cashaw* is questionable because the decision in that case was made by the Indeterminate Sentence Review Board, while *Miller*-fix sentences are imposed by trial courts. Moreover, even if *Cashaw*'s lower standard of review were to apply, a PRP is not an adequate

---

vacated and the court will impose a new term of confinement consistent with the court's decision after the resentencing proceeding." CP at 240.

26

substitute for an appeal because it provides limited bases for relief. *See* RAP 16.4(c).

These heightened protections of a direct appeal as compared to a PRP are especially significant in the context of juvenile sentencing. Indeed, we have recognized that "[w]hen a juvenile offender is sentenced in adult court, youth matters on a constitutional level." *Ramos*, 187 Wn.2d at 428. Prohibiting juveniles from appealing their *Miller* sentences not only violates their right to appeal, but runs contrary to our cases that bolster protections for juvenile offenders facing lengthy sentences. *E.g.*, *Bassett*, 192 Wn.2d 67; *Ramos*, 187 Wn.2d 420; *State v. Houston-Sconiers*, 188 Wn.2d 1, 21, 391 P.3d 409 (2017) (holding sentencing courts must have complete discretion to consider mitigating circumstances associated with the youth of any juvenile defendant).

The fact that Delbosque could seek review by PRP is therefore insufficient. The *Miller*-fix statute requires a full resentencing, and the sentence imposed must be subject to direct appeal. RCW 10.95.035(3) therefore violates the right to appeal in criminal cases guaranteed by article I, section 22.

## CONCLUSION

We affirm the Court of Appeals' holding that the trial court's findings were not supported by substantial evidence and hold that the Court of Appeals properly remanded Delbosque's case for resentencing. However, we reverse the Court of

Appeals' determination that the only avenue to review a *Miller* resentencing is by PRP. We therefore affirm in part, reverse in part, and remand for resentencing.

_____

WE CONCUR:

Fairhurst, C.J.P.T. _____

Stephens, C.J. _____

_____ (Johnson, J.)

Wiggins, J. _____

Madsen, J. _____

González, J. _____

Owens, J. _____

Gordon McCloud, J. _____

29