# NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83899-7-I |
| Respondent, | |
| v. | ORDER GRANTING MOTION TO PUBLISH |
| ERIC LEE KRUEGER, | |
| Appellant. | |

Respondent State of Washington moved for publication of the opinion filed on October 23, 2023. Appellant Eric Krueger has filed an answer. A panel of the court has reconsidered its prior determination not to publish the opinion for the above entitled matter and has found that it is of precedential value and should be published.

Now, therefore it is hereby

ORDERED that the written opinion, filed on October 23, 2023 shall be published and printed in the Washington Appellate Reports.

FOR THE COURT:

_____
Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83899-7-I |
| Respondent, | |
| v. | DIVISION ONE |
| ERIC LEE KRUGER, | PUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — In 1998, a jury convicted Eric Lee Krueger, then 20 years old, of first degree aggravated murder, two counts of first degree murder, conspiracy to commit first degree robbery, and first degree unlawful possession of a firearm with firearm enhancements for the three counts of murder, sentencing him to life without possibility of parole. In 2022, following our Supreme Court's decision in In re Pers. Restraint of Monschke,[1] which concluded that a sentence of mandatory life without the possibility of parole was unconstitutional for youthful offenders, Krueger was resentenced to 420 months with a 60 month firearm enhancement, for a total of 40 years. On appeal, Kruger contends the resentencing court erred by, (1) imposing a de facto life sentence, (2) failing to appropriately weigh his rehabilitative efforts, (3) finding that Krueger made minimal rehabilitative efforts and that his youthfulness did not impact his decision-making, and (4) failing to waive the firearm enhancement. He also

---

[1] 197 Wn.2d 305, 482 P.3d 276 (2021).

seeks a new judge on remand, asserting a violation of the appearance of fairness doctrine. Finding no error, we affirm.

FACTS

Background

In January 1997, Eric Krueger bought methamphetamine (meth) from Ronald Greenwood. During the transaction, approximately $140 fell out of Krueger's pocket onto the floor. He picked it up, placed it on the table between them, and then left the room. When he returned, both Greenwood and the money were gone. Krueger became angry, believing Greenwood had stolen the money.

Later that evening, Krueger, still angry, went to Robert Anderson's house seeking help to rob Greenwood. In addition to retrieving the stolen money, Krueger intended to take any cash or drugs that Greenwood might have, and likely his stereo system. The two men spent about an hour discussing robbing Greenwood at gunpoint. Krueger routinely carried a gun and had recently purchased another, which he offered to Anderson. When Anderson suggested killing Greenwood, Krueger did not object.

Following this discussion, Krueger paged Greenwood, asking him to meet to buy meth. Greenwood arrived, accompanied by Brady Brown, about 15 minutes later. Both Krueger and Anderson were armed.

Once in Greenwood's car, Krueger started having second thoughts about the robbery. He lied about having forgotten money for the deal and asked Anderson to go get it. Krueger followed, stating they were waiting on a third

2

person to bring the money. Once they were both out of the vehicle, Anderson indicated it was time to follow through on their plan. Krueger walked away and hopped a fence. Greenwood and Brown had stayed in the vehicle. Anderson got back in the car, the three men drove away, and Anderson ultimately shot Greenwood and Brown.

Krueger heard the gunshots and went back to find the car empty. He then rejoined Anderson and together they searched the car for drugs before driving it to a nearby motel. At the motel, Krueger and Anderson discovered while watching television that Greenwood had survived the initial shooting. When Krueger and Anderson realized that Greenwood had survived, Krueger lamented that Anderson had not done "the full thing, instead of screwing around" and Anderson suggested that "there's always a way to sneak into the hospital and take care of something." Greenwood later died in the hospital. Krueger, having recognized that he owned the gun that had killed two men, tossed the gun case into some bushes at the motel. Over the next few days, he retrieved the gun, buried it in his backyard, dug it up, and sold it.

Krueger provided this timeline in an interview with the Snohomish County Sheriff's Office four days after the shooting. He further told a detective that he had watched Anderson wipe the bullets with a towel before putting them in the gun. Krueger explained that Anderson was "making sure, just in case he used [the gun]" that there would be no fingerprints on the shells. When asked, Krueger denied wiping off his own bullets but stated he believed someone else had done the same to the bullets in his gun in the days prior to the shooting.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 83899-7-I/4

He continued, stating that he had considered killing Greenwood but decided against it. He explained that he had stepped out of the car when he did because he was afraid the situation would escalate and Anderson would shoot someone.

Krueger was charged with and convicted of first degree aggravated murder, two counts of first degree murder, conspiracy to commit first degree robbery, and first degree unlawful possession of a firearm with firearm enhancements for the three counts of murder. In March 1998, he was sentenced to life without the possibility of parole.

### Resentencing

In August 2021, the trial court ordered resentencing following our Supreme Court's decision in Monschke, which held life sentences without the possibility of parole unconstitutional for youthful offenders. Krueger was 20 years old at the time of his offense. The resentencing hearing took place in March 2022.

Per Monschke, the resentencing court considered the "mitigating circumstances related to the defendant's youth." Defense counsel sought a 25-year sentence with time served. Defense counsel pointed to Dr. Megan Carter's expert testimony about Krueger's youthfulness and decreased ability to understand risk and consequences and the DOC records as indicative of Krueger's rehabilitative efforts. The State agreed that youth was a mitigating quality but argued that the nature of the crime and Krueger's lack of rehabilitation warranted further time in prison.

4

No. 83899-7-I/5

After considering Krueger's youth and balancing it against his involvement in the planning and understanding of the risks of the crime, the court agreed with the State and followed its recommendation. The court resentenced Krueger to 420 months with an additional 60 months for the firearm enhancement, for a total of 40 years. Krueger appeals.

ANALYSIS

Krueger raises five issues on appeal, including whether his sentence is a de facto life sentence, whether the appropriate consideration was given to rehabilitative factors, whether certain factual findings are supported by substantial evidence, whether the court should have waived his firearm enhancements, and whether the court violated the appearance of fairness doctrine. We address each in turn.

Standard of Review

"We will reverse a sentencing court's decision only if we find 'a clear abuse of discretion or misapplication of the law.' " State v. Delbosque, 195 Wn.2d 106, 116, 456 P.3d 806 (2020) (internal quotation marks omitted) (quoting State v. Blair, 191 Wn.2d 155, 159, 421 P.3d 937 (2018)). A court abuses its discretion when " 'its decision is manifestly unreasonable or based upon untenable grounds.' " Delbosque, 195 Wn.2d at 116 (internal quotation marks omitted) (quoting State v. Lamb, 175 Wn.2d 121, 127, 285 P.3d 27 (2012)). " 'The untenable grounds basis applies if the factual findings are unsupported by the record.' " Delbosque, 195 Wn.2d at 116 (internal quotation marks omitted) (quoting Lamb, 175 Wn.2d at 127).

5

De Facto Life Sentence

Krueger contends that the court erred in imposing a de facto life sentence, asserting that Monschke extended the prohibition against sentencing juveniles to de facto life sentences to youthful offenders as well.  We disagree.

Sentencing standards for juveniles are different than those of adults because "the Eighth Amendment to the United States Constitution compels us to recognize that children are different."  State v. Houston-Sconiers, 188 Wn.2d 1, 18, 391 P.3d 409 (2017).  Thus, mandatory life imprisonment without parole for defendants under the age of 18 at the time of their crimes violates the Eighth Amendment.  Miller v. Alabama, 567 U.S. 460, 465, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).  This prohibition also " 'appl[ies] to juvenile homicide offenders facing de facto-life without parole sentences, not just 'literal' life without parole sentences.' "  State v. Haag, 198 Wn.2d 309, 320, 495 P.3d 241 (2021) (alteration in original) (quoting State v. Ramos, 187 Wn.2d 420, 437, 387 P.3d 650 (2017)).  But there is no bright-line test for what constitutes a de facto life sentence.  See, e.g., Haag, 198 Wn.2d at 327 (holding that a 46 year sentence constituted a de facto life sentence based on the defendant's specific circumstances); In re Pers. Restraint of Hinton, 1 Wn.3d 317, 360, 525 P.3d 156 (2023) (McCloud, J., concurring in dissent) (holding that a 37-year sentence was not a de facto life sentence); State v. Anderson, 200 Wn.2d 266, 280, 516 P.3d 1213 (2022) (holding that a de facto life sentence may be appropriate if the crime is not mitigated by youth).  Whether a sentence is a de facto life sentence is a

6

fact-specific inquiry closely tied to interpreting what constitutes a "meaningful life outside of prison." Haag, 198 Wn.2d at 327.

As with juveniles, there are sentencing limitations for youthful offenders. Whereas juvenile offenders are "any individual who is under the chronological age of 18 years," what constitutes a "youthful" offender is not statutorily codified and subject to interpretation. RCW 13.40.020(17) (defining "juvenile" offender); Monschke, 197 Wn.2d at 312 n.8 (noting that "youthful" offenders can be between 17 and 25 years old). For youthful offenders facing a mandatory life sentence without the possibility of parole, a court must exercise the same discretion in sentencing an 18-, 19-, and 20-year-old as when sentencing a 17-year-old. Monschke, 197 Wn.2d at 329. Washington courts, however, have repeatedly declined to extend Monschke's ruling to other fact scenarios. See, e.g., In re Pers. Restraint of Williams, 18 Wn. App. 2d 707, 716, 493 P.3d 779 (2021) (holding the Supreme Court limited Monschke to the aggravated first degree murder statute); State v. Nevarez, 24 Wn. App. 2d 56, 62, 519 P.3d 252 (2022) (holding that Monschke was inapplicable because the defendant did not receive a mandatory life without parole sentence); State v. Meza, 22 Wn. App. 2d 514, 545, 512 P.3d 608 (2022) (holding that Monschke did not categorically extend leniency based on the mitigating factors of youth).

Here, Krueger was 20 years old at the time he committed his crime, making him a youthful offender rather than a juvenile offender. Therefore, we do not need to reach whether the prohibition on de facto life sentences for juveniles applies or whether Krueger's sentence was a de facto life sentence at all.

7

Although Krueger proceeds as if <u>Monschke</u>'s ruling extends to de facto life sentences for youthful offenders, our Supreme Court was careful to detail the specific circumstances where the mitigating factors of youth apply. <u>Monschke</u>, 197 Wn.2d at 329. No case has extended those circumstances to include de facto life sentences and Krueger provides no authority for that proposition. Krueger is a youthful offender and given that there is no prohibition on de facto life sentences for youthful offenders, the court did not err in sentencing him to 40 years in prison simply because he insists it would amount to a de facto life sentence.

<u>Appropriate Weight of Rehabilitation Evidence</u>

Krueger asserts that the sentencing court erred by focusing more on the facts of Krueger's crime than on his rehabilitation efforts. He contends that the court failed to meaningfully consider his rehabilitation and that his job performance, participation in educational programming, and prison record should have impacted the resentencing court's decision more. We disagree. After considering all the evidence before it, the court appropriately considered and weighed Krueger's rehabilitative actions during sentencing.

At resentencing, the court must conduct "a forward-looking assessment of the defendant's capacity for change or propensity for incorrigibility, rather than a backward-focused review of the defendant's criminal history." <u>Delbosque</u>, 195 Wn.2d at 122. But the court is not prohibited from considering the defendant's criminal history at all. <u>Delbosque</u>, 195 Wn.2d at 122. We review a resentencing decision for abuse of discretion. <u>Delbosque</u>, 195 Wn.2d at 116.

8

Here, the resentencing court specifically recognized its duty to consider Krueger's rehabilitative actions. The court stated:

> [T]his Court is now faced with the decision and the responsibility to meaningfully consider both the mitigating qualities of youth at the time of the commission of this offense given the defendant's age of just shy of 21 and, additionally, consider the defendant's rehabilitation during the last 25 years of incarceration.

Having considered the whole record, the court determined that Krueger made little effort to rehabilitate himself. In reaching this conclusion, the court considered Krueger's DOC record, the letters written in support from fellow inmates, Krueger's psychological evaluation, and listened to Krueger's own testimony. Krueger's DOC record shows that the few classes he took in his 25 years in prison could have been completed in the span of one year and that he did not seek out any further education. It does not show Kruger involved in any mentorship. And Krueger's testimony, stating "I never thought it would have went that far. I mean, I tried to figure it out for years, and I couldn't really come up with nothing, because I can't speak for someone else," displayed his reluctance to take accountability for his own role in the crime. Dr. Carter's psychological evaluation focused on Krueger's immaturity at the time of his crime, but this does not contradict the court's determination that Krueger did little more than what was expected of him in prison and has not shown much growth.

The court also appropriately looked to the facts of the crime in making its determination. For instance, in an interview with the sheriff's office, Kruger stated that he had considered killing Greenwood himself, "just to make it an easier job." He also acknowledged that robbing Greenwood was his idea, that he

9

provided Anderson with the gun, and that he had watched as Anderson wiped the bullets for fingerprints. The court reasoned that these facts indicated a planned robbery, despite Krueger's assertions that he never intended for anyone to get hurt. After balancing Krueger's adverse childhood experiences, his youth and immaturity, and his rehabilitative efforts against his role in the planning and execution of the original offense, the court concluded that it would not be appropriate to impose a 25 year sentence.

The court's ruling is well within its discretion as a sentencing court. The fact that the defendant disagrees with the conclusion does not mean that the court did not consider all of the evidence. We conclude that the court appropriately considered Krueger's rehabilitation over the facts of his underlying offense.

Challenged Factual Findings

Krueger challenges two of the court's factual findings on appeal, (1) that he engaged in the "minimum things that a person would do while incarcerated," and (2) that it was "inconceivable" that Krueger's youth limited his ability to appreciate the risks and consequences of his action. Substantial evidence supports both findings.

" 'We review findings of fact for substantial evidence,' which 'exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding.' " Haag, 198 Wn.2d at 317 (internal quotation marks omitted) (quoting Lamb, 123 Wn.2d at 127).

1. <u>Krueger's Rehabilitative Effort</u>

Krueger contends that the resentencing court's finding that he had engaged only in the minimum rehabilitative behavior in prison was unsupported by substantial evidence. We disagree.

Here, Krueger's DOC record, Krueger's psychological evaluation, and Krueger's own testimony support the court's finding that Krueger made minimal efforts toward rehabilitation. As noted, Krueger's DOC record shows that the few classes he took in his 25 years in prison could have been completed in the span of one year. He did not seek out any further education. He did not engage in any substance abuse treatment. And his DOC record does not document any form of mentorship. Krueger testified that his mentorship was not "on the books" and that he'd "done more rehabilitation programs than what they've said," but acknowledged that he had not done as much as others seeking resentencing had. Rather, he spoke to "teaching staff how to do their own jobs." Sufficient evidence exists for a fair-minded, rational person to determine that Krueger had "been engaging in the minimum things that a person would do while incarcerated." The court looking for more than the minimum is not—as Krueger asserts—asking for exceptional rehabilitation.

And beyond the evidence of Krueger's rehabilitative actions in prison, his testimony at the resentencing did little to show that he had accepted responsibility for his actions. Although Krueger apologized to the Greenwood and Brown families, he focused on his "chicken[ing] out" and "trying to fit in with an older crowd that [he] should have never been involved with." He did not

11

acknowledge his role in organizing the robbery, nor did he take accountability for any of his actions afterwards. Substantial evidence supports the court's finding that Krueger made minimal efforts toward rehabilitation.

2. Impact of Youthfulness

Krueger similarly contends that the resentencing court finding it "inconceivable" that Kruger's youthfulness significantly impacted his ability to appreciate risks and consequences was unsupported by the record. Krueger points to his psychiatric evaluation, arguing that the resentencing court's conclusion contradicted the only expert evidence. We do not find this argument persuasive.

Krueger relies exclusively on the testimony of Dr. Megan Carter, the psychologist who conducted his forensic mental health evaluation, as evidence of his inability to appreciate risk and consequences at the time of his offense. He asserts that the court "ignored the uncontroverted opinion of an expert" and erred in concluding that he was capable of understanding the risks and consequences associated with the crime. In her evaluation, Dr. Carter stated that she believed Krueger "did not consider the consequences of the initial robbery plan and believed he could simply remove himself from the act to no longer be involved" and that this "indicate[d] youthful thinking and lack of planning or understanding of the situation." The court has discretion in resentencing. There is no requirement that the court agree with an expert witness. The court specifically considered Dr. Carter's evidence. However, the court determined that Krueger's actions were not simply the result of adverse childhood experiences and

12

immaturity as Dr. Carter opined and that he was not just a young person making a bad choice due to other people. The judge referenced Krueger planning the crime for revenge and the details involved before and after the murders as reasons this was not solely due to youth.

The evidence here supports the court's finding that Krueger understood the risks and consequences of his actions. For example, Krueger provided the gun for the robbery and, despite asserting that he never intended to shoot anyone, he arranged the killing. Almost every admission in Krueger's four-hour interview with the sheriff's office indicates that he understood the risks and consequences of robbing someone at gunpoint. In fact, Krueger explained that he stepped out of the car when he did because he was afraid that Anderson would shoot the men. And once Anderson did just that, Krueger searched Greenwood's car for money and drugs. In addition, when Krueger and Anderson realized, through watching the news in the motel, that Greenwood had survived, Krueger complained that Anderson had not done "the full thing, instead of screwing around." Krueger anticipated violence coming, acknowledging that he understood the risks and consequences of his actions. And even if he did not intend for anyone to be killed, the killing did not deter Krueger from following through with the intended robbery.

Substantial evidence supported the court's finding that Krueger's youth did not significantly impact his ability to appreciate risks and consequences.

No. 83899-7-I/14

### Firearm Enhancement

Krueger argues that under Houston-Sconiers, which grants courts discretion when sentencing juveniles to impose any sentence below the otherwise applicable range and enhancements, the resentencing court had discretion to waive the mandatory firearm enhancement. Because Houston-Sconiers does not apply to Krueger as a youthful offender, the resentencing court did not have discretion and appropriately imposed the firearm enhancement.

The Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, requires a mandatory five-year enhancement if the offender or an accomplice was armed with a firearm. RCW 9.94A.533(3)(a). Houston-Sconiers provides that "sentencing courts must have absolute discretion to depart as far as they want below otherwise applicable SRA ranges and/or sentencing enhancements when sentencing juveniles in adult court." 188 Wn.2d at 9.

Throughout his briefing, Krueger attempts to extend Monschke to apply juvenile standards to all youthful offenders. Continuing in that vein, Krueger asserts that the resentencing court had discretion as to the firearm enhancement, despite being 20 years old at the time of his offense. But Houston-Sconier's holding is narrow and applies only to juveniles. 188 Wn.2d at 9. As a 20-year-old, Krueger was not a juvenile offender facing adult court—he was an adult. And despite his assertion to the contrary, Monschke does not provide courts with "full discretion to depart from the sentencing guidelines and otherwise mandatory sentencing enhancements" for adults. Monschke does not address firearm

14

No. 83899-7-I/15

enhancement discretion at all.[2]  Per the language of the statute, the court was required to impose the five-year firearm enhancement.  There was no discretion to be abuse and the court did not err in imposing the firearm enhancement.

<u>Appearance of Fairness</u>

Finally, Krueger contends that the sentencing judge violated the appearance of fairness doctrine and asks that his case be assigned to a new judge on remand.  Because we affirm the resentencing court, we decline to reach this issue.

Affirm.

_____
Smith, C.J.

WE CONCUR:

_____          _____

---

[2]  This court addressed this issue in an unpublished opinion in 2021, specifically declining to extend <u>Monschke</u> to the firearm enhancement discretion of <u>Houston-Sconiers</u>.  <u>State v. Kasparova</u>, No. 81109-6-I, slip op. at 40 (Wash. Ct. App. Nov. 15, 2021) (unpublished) https://www.courts.wa.gov/opinions/pdf/811096.pdf.

15