# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54110-6-II |
| Respondent, | |
| v. | ORDER GRANTING MOTION FOR RECONSIDERATION AND WITHDRAWING OPINION |
| NGA NGOEUNG, | |
| Appellant. | |

Respondent, State of Washington, moves this court to reconsider its August 31, 2021 opinion. After consideration, we grant the motion. The court's August 31, 2021 opinion is hereby withdrawn and a new opinion will be filed in due course. It is

SO ORDERED.

Panel: Jj. Maxa, Cruser, Veljacic

FOR THE COURT:

_____
Veljacic, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54110-6-II |
| Respondent, | |
| v. | |
| NGA NGOEUNG, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — In 1995, a jury convicted Nga Ngoeung of two counts of aggravated murder in the first degree, two counts of aggravated assault in the first degree, and one count of taking a motor vehicle without the owner's permission. The trial court resentenced Ngoeung in 2015 under the "*Miller*[1] fix" statutes, RCW 10.95.035 and .030(3). He appeals the sentence he received in 2019 on remand from this court's decision in *State v. Nga (NMI) Ngoeung*,[2] his second resentencing under the *Miller* fix.

Ngoeung argues that the sentencing court erred in denying his motion to recuse the sentencing judge. He also argues that the court failed to meaningfully consider all of the *Miller* factors, failed to take into account his history when evaluating his potential for rehabilitation, and failed to explain why it imposed standard range consecutive sentences for his two assault

---

[1] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

[2] No. 47157-4-II (Wash. Ct. App. Dec. 27, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2047157-4-II%20Order%20Amending.pdf.

convictions. Finally, he asserts that the court improperly placed the burden to prove his youth as a mitigating factor on him, and that the burden of proof should instead have been on the State.

We do not reach Ngoeung's argument regarding recusal because he failed to provide us with an adequate record on which to review the issue. While recognizing the rapidly changing area of law related to life sentences in our state,[3] we conclude that the trial court both failed to meaningfully consider the *Miller* factors and failed to explain its reasoning in imposing Ngoeung's sentence. Accordingly, we reverse the sentence previously imposed and remand for resentencing.

## FACTS

### I. THE CRIME [4]

In August 1994, four high school boys drove down a Tacoma street throwing eggs. Some of the eggs hit a house that turned out to be a hangout for a local gang. Ngoeung, then age 17, Oloth Insyxiengmay, age 15, and Soutthanom Misaengsay, age 13, were associated with the gang and were outside the house during the egging. Believing the attack was gang related, Insyxiengmay entered the house and took the owner's rifle. The three boys got in a car, and with Ngoeung driving, followed the other car. Insyxiengmay put the rifle out the window and shot at the other boys' car. Two of the boys in the other car were killed.

---

[3] During the pendency of this appeal, our state Supreme Court has issued several new opinions impacting sentencing of juveniles, one of which squarely impacts this very case: *State v. Delbosque*, 195 Wn.2d 106, 456 P.3d 806 (2020).

[4] The facts from this section are taken in part from the Ninth Circuit's opinion in *Insyxiengmay v. Morgan*, 403 F.3d 657 (9th Cir. 2005).

Insyxiengmay, Ngoeung, and Misaengsay then returned to the house and Insyxiengmay handed the rifle to someone inside the house, told her to get rid of it, and said, "[w]e shot them up. We shot them up. They threw eggs at us, the Rickets.[5] We shot them up." *Insyxiengmay v. Morgan*, 403 F.3d 657, 661 (9th Cir. 2005). Ngoeung was arrested on September 3, 1994 and confessed to police that he drove the car during the shooting.

In 1995, the court tried Ngoeung as an adult and a jury found him guilty of two counts of aggravated murder in the first degree, two counts of assault in the first degree, and one count of taking a motor vehicle without the owner's permission (TMVWP). The court sentenced Ngoeung to two consecutive terms of the then-mandatory sentence of life without possibility of parole (LWOP) for the two aggravated murder in the first degree convictions. *Former* RCW 10.95.030(1) (1993). The court also sentenced him to 136 months and 123 months for the two assaults, and 8 months for the TMVWP count, all to be served consecutively following his aggravated murder sentences.

II.     FIRST RESENTENCING

Pursuant to the United States Supreme Court's decision in *Miller* v. *Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), and the subsequent "*Miller* fix"[6] implemented by the legislature in 2014, the trial court resentenced Ngoeung in January 2015. At that hearing, the court again sentenced Ngoeung to two LWOP sentences on the aggravated murder in the first degree convictions and ordered that the sentences run consecutively. It left the sentences for the assaults and TMVWP unchanged.

---

[5] A slang term for certain rival gang members.

[6] RCW 10.95.030 and .035.

### III.   FIRST APPEAL

Ngoeung appealed his sentence, arguing in part that his LWOP sentences were unconstitutional and that he received ineffective assistance of counsel. *State v. Ngoeung*, No. 47157-4-II, slip op. at 1-2 (Wash. Ct. App. Dec. 27, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2047157-4-II%20Order%20Amending.pdf. While the appeal was pending, the Washington Supreme Court held that a LWOP sentence for a juvenile was categorically barred by the state constitution. *State* v. *Bassett*, 192 Wn.2d 67, 91, 428 P.3d 343 (2018).

Accordingly, in an unpublished opinion, this court held that Ngoeung's sentences for LWOP were unconstitutional under *Bassett* and remanded to the trial court for resentencing. *Ngoeung*, No. 47157-4-II, slip op. at 9, 12.

### IV.   SECOND RESENTENCING

Pursuant to the remand, in September 2019, Ngoeung appeared before the same judge who had sentenced him in 2015, for a second *Miller* resentencing. Prior to the hearing, Ngoeung filed a motion to have the judge recuse himself. He argued that the judge made statements during the first resentencing in 2015 that would make a reasonably prudent, disinterested observer conclude the hearing was not fair and impartial.[7] The judge denied Ngoeung's motion.

At the second sentencing hearing, the court considered the parties' sentencing memoranda and appended materials, the testimony and report of defense expert Dr. Michael Stanfill, other expert reports, the testimony of and letters from Ngoeung's family, the testimony of the victim's families, and the prior submitted materials considered at the sentencing in January 2015.

---

[7] The transcript of the 2015 resentencing is not in the record.

A.      Mitigation Materials

The mitigation evidence included a report by a mitigation specialist, summarizing the circumstances in Ngoeung's life and included the following:

Ngoeung's parents fled from the Cambodian genocide to a refugee camp in Thailand where Ngoeung was born prematurely. Eventually in 1980, the family migrated to the United States.

Ngoeung began school at age 6 and repeated first grade three times. His education ended after fourth grade due to his difficulty learning English and paying attention, frequent absences, and no significant involvement by his parents in his education. At age 16, Ngoeung was "jumped" into a gang by his cousins. Clerk's Papers (CP) at 135. The report stated that joining a gang was not a choice in Ngoeung's neighborhood and at that time there were no other resources available to gain acceptance, safety, and money. His family also stated that Ngoeung as a young man was "gullible and could be easily manipulated." CP at 135.

Dr. Terry Lee's 2014 report stated Ngoeung's cognitive and psychosocial functioning at the time of his offense was different than that of an adult and was delayed relative to other 17 year olds. Lee opined that Ngoeung's experiences as a refugee and immigrant, acculturation problems, cognitive and language delays, developmental immaturity, poverty, life in a high crime area, limited education, exposure to domestic violence and harsh parenting, lack of positive role models, socializing with antisocial and assertive peers, and his untreated mental health problems all rendered him less culpable than an adult. Dr. Lee further concluded that at age 17, Ngoeung's decision-making and problem-solving skills were not fully developed and left him vulnerable to impulsivity and poor choices.

The mitigation packet also included a letter from Insyxiengmay, Ngoeung's codefendant. Insyxiengmay discussed Ngoeung at the time of the crime, stating that he "rarely said no to what others asked him to do or wanted to do. Although we were all teenagers, cognitively, Mr. Ngoeung seem[ed] to be the youngest among our group." CP at 119. Additionally, their relationship "was one where he took guidance and direction from me although he was my senior by a couple years." CP at 119.

During the years of his incarceration, Ngoeung participated in relatively little "programming." The mitigation report and Insyxiengmay's letter noted a Department of Corrections (DOC) policy "that 'lifers' and those in the custody [of the] DOC with ICE detainers, will be placed on the 'lowest priority' for programming opportunities." CP at 120. However, the report noted that since his 2015 resentencing to LWOP, Ngoeung had attempted to engage in the "little programming [that had] been available to him," including "Aggression Replacement Therapy . . . , Advanced Skills Building, Motivation Engagement, and Anger Control Therapy." CP at 143-44.

The State's sentencing information included records showing Ngoeung's continuing involvement with gangs as well as 50 serious prison infractions. The most serious of which included aggravated assault on another inmate in 2018 and participation in a riot in 2016. Since 2001, Ngoeung was involved in five separate incidents that resulted in sanctions of a minimum of nine months in administrative segregation for each incident.

Dr. Stanfill testified at the resentencing hearing and submitted a report consistent with his testimony. He discussed Ngoeung's record of infractions while incarcerated. He opined that the incidents of violence or aggression "were in direct response to Mr. Ngoeung living in a very dangerous setting for the past 24 years where there were strong values associated with violence

and abiding by a 'code' was required to maintain one's sense of safety, regardless of consequence." CP at 256. Dr. Stanfill concluded that Ngoeung's prison infraction history stemmed from his arrested development and the high rate of violence in the prison that he had to negotiate.

The State recommended two mandatory 25-year terms for the aggravated murder in the first degree convictions and terms at the low end of standard ranges for the two convictions for assault in the first degree and the conviction for TMVWP. The recommendation included a request to run the assault and TMVWP terms consecutive to the aggravated murder terms for a total of 66.5 years.

B.      The Court's Oral Ruling

The court discussed the evolution of case law covering the consideration of youth at sentencing. The court stated that it found *Bassett* "instructional because it's factually similar to the case at bar. Bassett was convicted at age 16 of three counts of aggravated murder in the first degree for killing his parents and a brother." Report of Proceedings (RP) (Sept. 6, 2019) at 90. However, the court noted that unlike Ngoeung, "Bassett had taken multiple steps toward rehabilitation." RP (Sept. 6, 2019) at 91.

The court acknowledged the evidence relating to Ngoeung's cognitive delay and mental health and concluded: "there is no doubt that at the time of the crime that was committed, the murders and assaults that were committed in this case, Mr. Ngoeung was operating at a level of cognitive function which was certainly well below normal." RP (Sept. 6, 2019) at 92. Also, "there is considerable evidence of psychological damage, something not behaviorally driven, but indeed part of an organic brain issue, whether that is genetic, related to earlier brain trauma or whatever." RP (Sept. 6, 2019) at 93.

The court continued by discussing rehabilitation, stating, "At the 2015 resentencing, the Court observed that Mr. Ngoeung had made no effort perceptively to engage in rehabilitative type of conduct, that being no further educational attainment, no skills acquisition. He eschewed mental health treatment, empathy training and the like." RP (Sept. 6, 2019) at 94.

The court noted that at the 2015 remand hearing Ngoeung's attorney argued "that with the prospect of a lifetime of imprisonment, there was no motivation for Mr. Ngoeung to rehabilitate since he needed to focus on adaption to survival in the penitentiary." RP (Sept. 6, 2019) at 94. The court continued:

> While that was an explanation for the choices Mr. Ngoeung made, it misses the point of what rehabilitation actually is.
>
> Rehabilitation must be internally driven and those efforts undertaken for their own sake to make the individual being rehabilitated a better functioning person, to make behavioral adjustments because it's the right thing to do, irrespective of the duration of a person's incarceration.
>
> . . . .
>
> It is a matter of judgment, and my judgment comes down to this:
>
> Mr. Ngoeung will be resentenced to two 25 year to life terms of imprisonment that will be served concurrently. And then they will be followed consecutively [with the two convictions for assault in the first degree] by 102 months []and 93 months[, respectively].
>
> By my rough calculation, that comes to 195 months that will be consecutive to the 25 years to life sentence for the murders.
>
> After all of that time is done, then the ISRB [Indeterminate Sentence Review Board] will be able to make its determinations.
>
> The eight months on the [conviction for TMVWP] can be served concurrent with all of the rest of this.

RP (Sept. 6, 2019) at 94-97.

C.      Findings of Fact

The court entered findings of fact that stated in relevant part:[8]

> 10.      [The] mitigation report on Mr. Ngoeung's family and social history detailed many instances and examples of seizures, head trauma, developmental delays, and difficulties in school while growing up suffered by Mr. Ngoeung.
> 11.      Dr. Stanfill's report and testimony indicating that Mr. Ngoeung was immature, less cognitively complex, overly compliant to antisocial peers, and directly impacted by numerous socioeconomic, geographic, and other social factors outside his control.
> 12.      Dr. Terry Lee's mental health report dated November 5[], 2014, was reviewed by the Court and was consistent with Dr. Stanfill's findings.
> 13.      Dr. Kathleen Mayers's 1990 report found that [] Ngoeung was disabled for the purposes of social security. Mr. Ngoeung's Wechsler Intelligence test for children, taken during that evaluation and in widespread usage across the United States, yielded a full-scale IQ of 55, placing Mr. Ngoeung in the mildly retarded range of mental functioning.
> 14.      At the time the crimes were committed in this case, Mr. Ngoeung was likely in a borderline range for mental retardation and certainly well below normal intellectual functioning.
>          . . . .
> 17.      The reports from DOC highlight that the deficits that were observed in 1995 have persisted longitudinally and add credibility to those initial findings.
> 18.      There is considerable evidence of Mr. Ngoeung's psychological damage; it is likely some organic brain issue that is not behaviorally driven. It is unknown if the etiology is genetic or related to some earlier trauma to the brain.

CP at 517-18.

> The court concluded:

> There are substantial and compelling reasons involving the attributes of youth and Mr. Ngoeung's personal attributes in this case to justify an exceptional sentence of running counts 1 and 2 concurrently (each a 25 years to life sentence) to each other under *State* v. *Gilbert*, 193 Wn.2d 169, 438 P.3d 133 (2019), and the non-exclusive mitigating factors of RCW 9.94A.535(1).

---

[8] The findings of fact regarding the crime and Ngoeung's general history are verities on appeal and are incorporated into the facts section above. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003) (unchallenged findings of fact are verities on appeal).

CP at 519.  Ngoeung appeals.[9]

ANALYSIS

I.    JUDICIAL BIAS

Ngoeung argues that the sentencing judge erred in denying his motion to recuse.

Under the state and federal constitutions, a criminal defendant has the right to be tried and sentenced by an impartial court.  U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22.  The law requires more than an impartial judge; it requires that the judge also appear to be impartial. *State v. Gamble*, 168 Wn.2d 161, 187, 225 P.3d 973 (2010).  The party asserting a violation of the appearance of fairness doctrine must show a judge's actual or potential bias.  *Id*. at 187-88.

A party seeking review has the burden of perfecting the record so that the appellate court has before it all the evidence relevant to the issue.  *State v. Garcia*, 45 Wn. App. 132, 140, 724 P.2d 412 (1986).  Ngoeung's argument below was based on statements made by the trial court at the 2015 resentencing.  Although Ngoeung quotes various statements in his briefing on appeal and in his motion to recuse following the last remand, the transcript of that resentencing is not in the record.  We cannot determine if the challenged statements show evidence of bias without the context that they appear in.  Because Ngoeung has failed to provide an adequate record for review, we decline to address the argument.

Ngoeung also requests a new judge on remand.  Reassignment may be sought on appeal in limited circumstances, but is "generally not available as an appellate remedy if an appellate opinion offers sufficient guidance to effectively limit trial court discretion on remand." *State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703 (2017).  We decline to reassign because there has been no

---

[9] On November 18, 2020, after this appeal was filed the ISRB conducted a release hearing pursuant to RCW 10.95.030(3)(f) and RCW 9.94A.730.  It declined to release Ngoeung.  ISRB (Final Decision Date Dec. 14, 2020).

showing that the sentencing judge is unable to apply the law from this opinion while otherwise exercising the discretion allowed.

II.     CONSIDERATION UNDER *MILLER*

Ngoeung requests that we reverse and remand for resentencing.  He argues that the sentencing court (1) failed to meaningfully consider all of the *Miller* factors, including the extent of his participation in the crime and whether his youth and intellectual disability impacted his legal defense; (2) failed to take into account his history when evaluating his potential for rehabilitation; and (3) failed to explain why it imposed a standard range, consecutive sentence for his assault convictions, despite finding that he was entitled to a minimum, concurrent sentence for the aggravated murder convictions.  Before addressing each of these arguments in turn, we discuss general principles related to this subject matter.

A.     General Legal Principles

Prior to *Miller*,[10] Washington imposed a mandatory sentence of life without the possibility of parole for an offender convicted of aggravated murder in the first degree, regardless of the offender's age. *Bassett*, 192 Wn.2d at 73-74.  In response to *Miller*, our legislature enacted the "*Miller* fix" statute, which provides:

> (ii) Any person convicted of the crime of aggravated first degree murder for an offense committed when the person is at least sixteen years old but less than eighteen years old shall be sentenced to a maximum term of life imprisonment and a minimum term of total confinement of no less than twenty-five years.  A

---

[10] In *Miller*, the United States Supreme Court held that it was unconstitutional to impose mandatory life without parole sentences for juvenile homicide offenders.  567 U.S. at 489.  The Court based its determination on the fact that juvenile offenders have diminished culpability and are "'less deserving of the most severe punishments'" because they lack maturity and have an underdeveloped sense of responsibility, they are more vulnerable to outside pressures and negative influences, and their traits are less likely to be evidence of irretrievable depravity. *Id*. at 471 (quoting *Graham v. Florida*, 560 U.S. 48, 68, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)).

minimum term of life may be imposed, in which case the person will be ineligible for parole or early release.

(b) In setting a minimum term, the court must take into account mitigating factors that account for the diminished culpability of youth as provided in [*Miller*, 132 U.S. 460] including, but not limited to, the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated.

RCW 10.95.030(3).[11]

Subsequently, the Washington Supreme Court held that, even if not mandatory, a sentence of life without parole for juvenile offenders was unconstitutional and, therefore, RCW 10.95.030(3)(a)(ii) was unconstitutional to the extent that it allowed such a sentence. *Bassett*, 192 Wn.2d. at 91.

Later, in applying *Miller* to a de-facto life sentence, the Washington Supreme Court held that if a sentencing court finds that an exceptional sentence is warranted, it has the discretion to "adjust the standard sentence to provide for a reduced term of years, for concurrent rather than consecutive sentences, or for both." *Gilbert*, 193 Wn.2d at 176-77.

We glean from these authorities that any life sentence without the possibility of parole for a juvenile is unconstitutional. Further, a sentencing court has discretion to depart from any statutory guidance for sentencing to provide for a lower sentence. Additional recent authorities require the sentencing court to consider several factors and to explain its reasoning. Those authorities are discussed below.

---

[11] The "*Miller* fix" bill also created RCW 10.95.035, which required resentencing for any juvenile offender sentenced to life without parole prior to passage of the bill (SSSB 5064). RCW 10.95.035(1) requires resentencing of these offenders to be performed consistent with the amended RCW 10.95.030. The bill also enacted RCW 9.94A.730, which allows most juvenile offenders to petition the ISRB for release once they have served 20 years in prison, excluding sentences for aggravated murder in the first degree under RCW 10.95.030. RCW 9.94A.730(1).

B.        Standard of Review

An appeal from a resentencing under RCW 10.95.030 is a direct appeal of the newly-imposed sentence. *State v. Delbosque*, 195 Wn.2d 106, 128, 456 P.3d 806 (2020). We will reverse a sentencing court's decision only if we find "'a clear abuse of discretion or misapplication of the law.'" *Id*. at 116 (internal quotation marks omitted) (quoting *State v. Blair*, 191 Wn.2d 155, 159, 421 P.3d 937 (2018)). A trial court abuses its discretion when "'its decision is manifestly unreasonable or based upon untenable grounds.'" *Delbosque*, 195 Wn.2d at 116 (internal quotation marks omitted) (quoting *State v. Lamb*, 175 Wn.2d 121, 127, 285 P.3d 27 (2012)). Significantly, a trial court "lacks the discretion to impose a standard range sentence without first considering the mitigating circumstances of youth where the defendant committed the crime as a juvenile." *State v. Backstrom*, 15 Wn. App. 2d 103, 106, 476 P.3d 201 (2020). We next address Ngoeung's arguments in turn.

C.        Requirement of "Meaningful Consideration" of Youth Under RCW 10.35.030, *Gilbert*, and *Delbosque*.

In exercising its discretion in sentencing a juvenile, the court must consider

the mitigating circumstances related to the defendant's youth, including, but not limited to, the juvenile's immaturity, impetuosity, and failure to appreciate risks and consequences—the nature of the juvenile's surrounding environment and family circumstances, the extent of the juvenile's participation in the crime, the way familial and peer pressures may have affected him or her, how youth impacted any legal defense, and any factors suggesting that the juvenile might be successfully rehabilitated.

*Gilbert*, 193 Wn.2d at 176.

Trial courts, whether sentencing a juvenile pursuant to RCW 10.95.035 or whether sentencing under title 9.94A RCW, have the affirmative duty to "'*meaningfully* consider'" the individual circumstances of the particular youthful offender and the offense. *Delbosque*, 195

14

Wn.2d at 121 (quoting *State v. Ramos*, 187 Wn.2d 420, 434-35, 387 P.3d 650 (2017)). In doing so, the court must "tak[e] care to thoroughly explain its reasoning." *Gilbert*, 193 Wn.2d at 176; *see also Ramos*, 187 Wn.2d at 443-44 ("[A] court conducting a *Miller* hearing must do far more than simply recite the differences between juveniles and adults and make conclusory statements that the offender has not shown an exceptional downward sentence is justified. . . . The sentencing court must thoroughly explain its reasoning, specifically considering the differences between juveniles and adults identified by the *Miller* Court and how those differences apply to the case presented.").[12]

> 1.      Factors Relating to Culpability at the Time of the Offense

The Supreme Court has not mandated that sentencing courts address on the record a specific number of factors in order to have "meaningfully" considered a defendant's youth. Nonetheless, the trial court was required at the very least to meaningfully consider whether youth diminished Ngoeung's culpability. RCW 10.95.030(3)(b); *Delbosque*, 195 Wn.2d at 115, 121.

Demonstrating a thorough study and understanding of the legal framework at the time, the court here outlined the case law covering *Miller* sentencings and discussed the findings of the reports in the mitigation package. The court acknowledged in its oral ruling that "there is no doubt that at the time of the crime that was committed, . . . Ngoeung was operating at a level of cognitive function which was certainly well below normal." RP (Sept. 6, 2019) at 92. Additionally, the court's written findings of fact focus primarily on Ngoeung's impaired cognitive functioning.

---

[12] Although *Ramos* and *Basset* did not involve a *Miller* resentencing as is the case here, the Supreme Court noted "although neither case directly applied RCW 10.95.035, both discuss issues that are highly relevant to what is required when setting a minimum term pursuant to the *Miller*-fix statute. Much of their analysis therefore applies to this case and to *Miller* hearings pursuant to RCW 10.95.030." *Delbosque*, 195 Wn.2d at 120.

However, and despite these findings, the court did not explain how Ngoeung's cognitive delay related to the attributes of youth like immaturity, impetuosity, and failure to appreciate risks and consequences. *Gilbert*, 193 Wn.2d at 176. More importantly, as required by *Delbosque*, it did not discuss whether Ngoeung's youth diminished his culpability.

The court did not, on the record, discuss "the degree of responsibility that [Ngoeung] was capable of exercising." RCW 10.95.030(3)(b). Thus, it failed to account for "the way familial and peer pressures may have affected [Ngoeung]" despite mitigation evidence that due to his age and cognitive delay he was "easily manipulated" and "gullible." *Gilbert*, 193 Wn.2d at 176; CP at 135. According to the record, the court also did not consider the extent of Ngoeung's participation in the crime, as the driver rather than the shooter.

Defense counsel addressed Ngoeung's lack of education, cognitive delay, and language barrier, and how that affected his decision whether to plead guilty and testify against his friends like Misaengsay did. However, the court did not discuss how Ngoeung's youth "impacted any legal defense." *Gilbert*, 193 Wn.2d at 176.

The sentencing court here did not have the benefit of the *Delbosque* decision, which issued several months after the sentencing at issue here. In *Delbosque*, the Supreme Court noted its concern that the trial court had "oversimplified and sometimes disregarded Delbosque's mitigation evidence." 195 Wn.2d at 118-19. The Supreme Court also expressed concern that the sentencing court's ruling did "little to acknowledge Delbosque's mitigation evidence demonstrating his capacity for change." *Id*. at 119. The trial court heard testimony regarding Delbosque's qualification for lower security levels, his minimal number of infractions while incarcerated, and his low risk for future dangerousness. *Id*. This testimony was "not addressed" in the sentencing

court's analysis, which suggested to the Supreme Court that the sentencing court "did not adequately consider" it. *Id*. at 119-20.

Similarly here, Ngoeung submitted mitigation evidence and testimony demonstrating his lack of culpability due to his immaturity, the nature of his surrounding environment and family circumstances, the extent of his participation in the crime, the way peer pressure may have affected him. However, this evidence was not addressed in the sentencing court's analysis, suggesting that the sentencing court "did not adequately consider" it. *Id*. at 119-20.[13]

If the court did "specifically consider[] the differences between juveniles and adults identified by the *Miller* Court and how those differences apply to [Ngoeung's case,]" it failed to thoroughly explain its reasoning on the record. *Ramos*, 187 Wn.2d at 444. So, although we could infer that the concurrent sentences for these horrible murders reflected some diminished culpability, a sentencing court must *expressly* consider the impact of youth on culpability so that this consideration appears on the record.

2.    Potential for Rehabilitation

The court also failed to meaningfully consider all of Ngoeung's evidence regarding his potential for rehabilitation because it did not address how the evidence related to Ngoeung's capacity to change. Its oral ruling focused primarily on Ngoeung's pre-2015 incarceration record and his failure to engage in programming; the court discussed this in relation to the requirement that "sentencing courts [] meaningfully consider 'mitigating factors that account for the diminished culpability of youth,' including 'the youth's chances of becoming rehabilitated.'" *Delbosque*, 195 Wn.2d at 120 (quoting RCW 10.95.030(3)(b)). The court found the explanation for Ngoeung's

---

[13] Delbosque challenged the court's factual findings and the court reversed because substantial evidence did not support findings of fact, however, the requirement that a sentencing court adequately consider mitigation evidence applies here regardless.

apparent lack of effort in engaging in rehabilitation unpersuasive, stating, "[r]ehabilitation must be internally driven . . . because it's the right thing to do, irrespective of the duration of a person's incarceration." RP (Sept.6, 2019) at 94.[14]

The court was well within its discretion to consider evidence of lack of rehabilitation. *Ramos*, 187 Wn.2d at 449. Indeed, "'[t]he key question is whether the defendant is capable of change.'" *Delbosque*, 195 Wn.2d at 122 (quoting *United States v. Briones*, 929 F.3d 1057, 1066 (9th Cir. 2019)). But, the court also should have considered the evidence of rehabilitation since Ngoeung's 2015 hearing, and addressed how it related to Ngoeung's capacity for change given the crucial role such information plays in juvenile sentencing.[15] Specifically, the court here failed to mention that, according to the mitigation report, since his 2015 resentencing to LWOP, Ngoeung had attempted to engage in the "little programming [that] had been available to him," including "Aggression Replacement Therapy . . . , Advanced Skills Building, Motivation Engagement, and Anger Control Therapy." CP at 143-44. Under *Delbosque*, the court is required to meaningfully consider such evidence. 195 Wn.2d at 120 (the trial court must engage in a meaningful, forward looking assessment of the individual's capacity for change).

---

[14] But, the Supreme Court has recognized the impact that a life sentence alone has on a juvenile's rehabilitation, stating, "A young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual." *Graham v. Florida*, 560 U.S. 48, 79, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

[15] "In clarifying what is required in a *Miller* hearing, the Ninth Circuit declared that sentencing courts 'must reorient the sentencing analysis to a forward-looking assessment of the defendant's capacity for change or propensity for incorrigibility, rather than a backward-focused review of the defendant's criminal history.'" *Delbosque*, 195 Wn.2d at 1222 (quoting *Briones*, 929 F.3d at 1066).

The *Delbosque* sentencing court similarly omitted favorable rehabilitation evidence in its analysis:

> Similarly, the oral ruling does little to acknowledge Delbosque's mitigation evidence demonstrating his capacity for change. The Court of Appeals highlighted testimony that Delbosque "would qualify for minimum security except for the term of his sentence and an immigration detainer." [*State v.*] *Delbosque*, 6 Wn. App. 2d [407,] 410, 430 P.3d 1153 [(2018)]. In addition, Dr. Saint Martin testified that Delbosque's relatively few infractions over a 23-year period, coupled with his progressive decrease in security level, were proof that he was not irreparable and in fact could safely be released. He further opined that Delbosque's risk for future dangerousness would be low. This evidence, however, was not addressed in the trial court's analysis.

195 Wn.2d at 119.

The sentencing court here erred in not addressing all favorable evidence of rehabilitation in its analysis and in not explaining how it relates to Ngoeung's potential for rehabilitation.

Next, Ngoeung argues that the sentencing court failed to consider how his cognitive disability diminished his opportunity for rehabilitation. He asserts that this failure provides an independent basis for reversal. Because we remand for resentencing, we do not address this argument.

D.      Failure to Explain Standard Sentence Range for Assault Charges

Ngoeung argues that the court failed to explain why it imposed a standard range, consecutive sentence for his assault convictions, despite finding that he was entitled to a minimum, concurrent sentence for aggravated murder convictions.

In *Gilbert*, the court held that the sentencing court could consider the mitigating circumstances related to the defendant's youth, "the convictions at issue, the standard sentencing ranges, and any other relevant factors—and should then determine whether to impose an

exceptional sentence, *taking care to thoroughly explain its reasoning*." 193 Wn.2d at 176 (emphasis added).

We also note that after oral argument on this case, Division I of this court decided *State v. Rogers*, 17 Wn. App. 2d 466, 487 P.3d 177 (2021). In that case, the court addressed the State's appeal of an exceptional sentence below the standard range based on youth as a mitigating factor. *Id.* at 468. In response to the State's argument that the sentence was too lenient and thus unlawful, Rogers argued that an exceptional sentence based on youth cannot be reviewed on appeal. *Id.* Judge Dwyer wrote for the court, which rejected Rogers's argument, noting the importance of meaningful appellate review to prevent arbitrary sentencing decisions. *Id.* Accordingly, it held that when a sentencing judge determines that youth is a mitigating factor and exercises their discretion to impose an appropriate sentence, they "(1) must explain the reasons for their determination, and (2) those reasons must be rationally related to evidence adduced at trial or present at sentencing." *Id.* at 480. The court continued, "We do not require that sentencing courts explain the calculation leading to the precise length of the sentence imposed. Instead, the court must provide sufficient reasoning to allow for meaningful appellate review as to whether any reasonable judge could make the same decision based on the evidence and information before the sentencing judge." *Id.* at 481. We adopt the approach of the *Rogers* court.

In resentencing Ngoeung, the court did not explain why it imposed the particular sentence it did. It did not explain why the mitigating factors of youthfulness warranted an exceptional sentence in the form of running the aggravated murder charges concurrently, while still imposing standard sentence ranges for the assaults and simultaneously running those consecutively.

The trial court has broad discretion in imposing an appropriate sentence. However, here the trial court abused its discretion by failing to articulate a full and meaningful consideration of

Ngoeung's youth as a mitigating factor during sentencing and by failing to explain its reasoning in imposing a sentence seemingly inconsistent with its findings of fact. Therefore, we reverse and remand for the trial court to resentence Ngoeung consistent with this opinion.

E. Eligibility for Release as a "Sufficient Remedy"

The State appears to argue that because he is eligible for release by the ISRB, Ngoeung has received a "sufficient remedy." Br. of Resp't at 32. At oral argument, the State also asserted that this case is now moot for the same reason. Wash. Court of Appeals, *State of Washington v. Nga Ngoeung*, No. 54110-6-II (April 8, 2021), at 9 min., 31 sec. through 9 min., 53 sec. (on file with court). But the State's argument is inapposite. In *Houston-Sconiers*, the Supreme Court recognized that the existence of a statute that "may offer the possibility of another remedy in the future, or on collateral review, does not resolve whether petitioners' sentences are unconstitutional and in need of correction now. . . . Statutes like RCW 9.94A.730 may provide a remedy *on collateral review . . .* but they do not provide sentencing courts with the necessary discretion to comply with constitutional requirements in the first instance." 188 Wn.2d at 22-23 (emphasis added).

III. BURDEN OF PROOF

Ngoeung argues that the court erroneously applied the Sentencing Reform Act of 1981's exceptional sentencing provision, and thus improperly placed the burden on Ngoeung to prove that an exceptional sentence of concurrent terms was warranted. Because we remand for resentencing, we do not address this argument.

IV. PRESUMPTION OF EXCEPTIONAL SENTENCE

Ngoeung also argues that the authorities necessitate that the court presume his youth required an exceptional sentence. He further asserts that given this presumption, the prosecution

"failed to show by any standard of proof that [Ngoeung]'s sentence should exceed the presumptive minimum." Br. of Appellant at 54.

In *State v. Gregg*, which was decided after the parties submitted briefing, the Washington Supreme Court expressly rejected the argument that when sentencing a juvenile, the court "must start with a general presumption that a mitigated sentence is required unless the State proves otherwise." 196 Wn.2d 473, 482, 474 P.3d 539 (2020). Ngoeung's argument is without merit because it is contrary to law.

## CONCLUSION

Accordingly, we reverse the sentence previously imposed and remand for resentencing consistent with this opinion and current authority.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Maxa, P.J.

Cruser, J.