# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56529-3-II |
| Respondent, | |
| v. | |
| CHRISTOPHER ALEX SLIPKO, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Christopher Slipko pleaded guilty to one count of first degree murder and two counts of first degree assault for crimes he committed when he was 15 years old. The parties made a joint recommendation for an exceptional mitigated sentence based on the mitigating qualities of Slipko's youth. The sentencing court decided that an exceptional mitigated sentence was appropriate, but imposed a greater sentence than the joint recommendation.

Slipko appeals his sentence. He argues that (1) the sentencing court failed to meaningfully consider the mitigating qualities of youth as they applied to him, (2) the sentencing court erred by presumptively applying the adult Sentencing Reform Act of 1981 (SRA)[1] standards, (3) the case should be remanded to a different sentencing court judge, (4) the judgment and sentence erroneously included discretionary supervision fees, the victim penalty assessment (VPA), and the DNA collection fee, and (5) remand is necessary to correct a scrivener's error in the judgment.

---

[1] Ch. 9.94A RCW.

We affirm the trial court's exceptional sentence. However, we remand to the superior court to strike discretionary supervision fees, the DNA collection fee, and correct a scrivener's error in the judgment and sentence. We also remand for the superior court to determine Slipko's indigency and, following this determination, reconsider the imposition of the VPA.

FACTS

I. BACKGROUND

In January 2021, Slipko agreed with two friends and his younger brother to rob S.K., an acquaintance of Slipko's.[2] The group lured S.K. to Slipko's apartment complex purportedly to buy drugs from Slipko. S.K.'s cousin, J.P., and S.K.'s pregnant girlfriend, J.R., were in S.K.'s car. After S.K. paid Slipko for the drugs, Slipko pulled out a gun and pointed it directly at S.K., and said, "Give me all your sh[*]t!" Clerk's Papers (CP) at 317. S.K. accelerated away. As S.K. drove away, both Slipko and one of his friends fired shots at the fleeing car. As S.K.'s car turned the corner away from the apartment complex, two others in the group, including Slipko's younger brother, opened fire at S.K.'s fleeing car. A bullet fired by Slipko's brother struck S.K. in the neck. S.K. died from his injuries eight days later.

Slipko was charged in juvenile court with first and second degree murder, three counts of first degree assault, conspiracy to commit first degree robbery, and second degree unlawful possession of a firearm.

---

[2] The crimes were committed about two weeks before Slipko's 16th birthday.

## II. Slipko's Psychological Evaluation and Mitigation Package

Slipko received a forensic psychological evaluation by Dr. Brent Oneal to evaluate mental functioning and psychological factors relevant for consideration in declination proceedings. The evaluation described Slipko's family, academic, social, criminal, and substance abuse history. It stated that Slipko was physically abused by his biological father and he regularly observed his father abuse his mother. His father used drugs and alcohol and left the home when Slipko was young. Additionally, Slipko was raised by a single mother who did not provide discipline, his family grew up in poverty in a high-crime area, and Slipko struggled academically in school.

According to the psychologist, Slipko acknowledged needing help to address his problems, demonstrated a positive attitude toward personal change, and recognized the value of therapy and personal responsibility. But the psychologist also stated in his evaluation that Slipko's aggressive behaviors could pose a problem for treatment. The psychologist opined that Slipko met the criteria for post-traumatic stress disorder (PTSD), major depressive disorder, conduct disorder, and polysubstance use disorder based on his reported history and behaviors. The psychologist concluded that Slipko posed a "moderate-to-high risk of future violence, based on moderate violent and aggressive tendencies, high level of planned and extensive criminality, [and] high level of callous-unemotional traits," but that there were "good prospects of rehabilitation" for him in the juvenile justice system given his high level of motivation and amenability for treatment. CP at 308, 310.

Slipko's counsel also prepared a mitigation package that included information about Slipko's background. The package suggested that Slipko's academic struggles as a child may have been, in large part, due to a language barrier. Slipko's family immigrated to the United States

from Ukraine before he was born and spoke Russian in the household. Slipko reported that he began using marijuana on a daily basis starting at the age of 10 and abused other substances like acid, alcohol, "Molly," and cocaine. CP at 298. Slipko said he was always high when he committed crimes.

III. DECLINATION HEARING

On November 23, 2021, the parties appeared before the juvenile court for a declination hearing to determine whether juvenile court authority should be retained. The parties presented a written stipulation and agreement in which Slipko waived his right to a contested decline hearing, stipulated to facts regarding his role in the commission of the crime, and requested transfer of his case to adult court. The agreement also showed that Slipko agreed to plead guilty in adult court to one count of first degree murder and two counts of first degree assault, all with firearm sentencing enhancements. In return, the State agreed to a joint sentencing recommendation whereby, if accepted by the sentencing court, Slipko would be released on his 25th birthday. The joint recommendation amounted to nine years of confinement, plus an additional three years of community custody. Slipko acknowledged that the court was not bound by the parties' sentencing recommendation and could impose the maximum sentence authorized by law.

The juvenile court heard from both parties about the propriety of declining Slipko from juvenile court to adult court. The State noted that decline would offer a greater period of time to rehabilitate Slipko than the Juvenile Justice Act (JJA)[3] would allow, stating that "there is some

---

[3] Ch. 13.40 RCW.

hope and optimism that he can be rehabilitated[] and that he can turn things around." Verbatim Rep. of Proc. (VRP) (Nov. 23, 2021) (declination hearing) at 17.

The juvenile court said that it reviewed a copy of the stipulation and Slipko's mitigation package, which included the psychological evaluation. Following its review of the materials, the juvenile court commented:

> Looking at these, and in particular I was struck by the psychological evaluation, the psychologist pointed out . . . . a number of very significant things, and they're also pointed out here in the stipulation.
>
> One of them is sort of the level of autonomy that [Slipko] was operating under when this offense was happening. Basically, he was not involved actively in school, a lot of absentees. He wasn't following the rules at home. Basically, kind of living the rule[s] of the street. He was involved in adult activities. Not necessarily committed by adults but involved other individuals that were older than him that were involved in gun-related offenses, robberies, drug-related offenses. All of that showing a significant level of adult criminal-type behaviors.
>
> That's significantly a concern because if you consider a juvenile and what's believed to be the adolescent brain development where a juvenile's brain doesn't fully develop they say until between the ages of 23 and 25, if you keep a person involved in those kind[s] of activities in the juvenile system, and they get released at age 21, they haven't matured. They haven't really developed the kind of skills that would be appropriate to help them be able to survive in the adult world after that.

VRP (declination hearing) at 25-27. Ultimately, the juvenile court concluded that adult jurisdiction was in the best interests of both Slipko and the public, and Slipko was declined to adult court.

IV. GUILTY PLEA, VICTIM IMPACT STATEMENTS, AND JOINT RECOMMENDATION

Later the same day, the case proceeded with plea and sentencing in adult court before the same judge. Slipko pleaded guilty to one count of first degree murder and two counts of first degree assault, all with firearm sentencing enhancements. Prior to accepting the plea, the sentencing court reconfirmed with Slipko that although the parties would be presenting a joint

5

recommendation, he understood the sentencing court was not bound by the parties' recommendation. The sentencing court also confirmed with Slipko the standard range for each count, which amounted to a total standard range of 606 to 742 months with enhancements. Following its colloquy with Slipko, the sentencing court accepted his guilty plea.

The sentencing court next heard testimony from S.K.'s family. The family did not support the joint sentencing recommendation. S.K.'s mother told the sentencing court,

> The plea that is being offered to you, [Slipko], today makes me sick. Our state is failing those who walk in our shoes, the victims. . . .
>
> [Slipko] is being offered nine years until he's 25 until his brain reaches adult maturity. So[,] [Slipko] will spend only his immature years of his life in juvenile detention. Then as soon as he reaches the mature age, the age they are saying that your brain is fully developed to understand right from wrong and the severity of the crimes committed, he's just going to be released. How is that going to rehabilitate anyone?
>
> Here all of us are struggling every day with broken hearts, serious mental health issues, PTSD, anxiety, depression, et cetera, because our loved one was murdered, and our state is so worried about the offenders and their comfort and their needs and rehabilitating them. I won't say that part. Where is our comfort? When does someone address our needs? Where's our rehabilitation? We are being treated as though we committed the crimes. Open your eyes, people. See things from our shoes. You're failing all of us.
>
> . . . .
>
> This is sickening and very sad. I get very angry and emotional about all of this. Say it? You motherf[*]ckers murdered my son, and just like every other time before you guys found yourself in trouble, you are being forced to suffer the consequences. Just please listen to what I'm saying and don't allow these boys to get away with murder. Hand them a punishment that makes an impact on them, and maybe then less people will have to walk in our shoes. . . .

VRP (Nov. 23, 2021) (guilty plea and sentencing) at 17-19. After the family's statements

concluded, Slipko's counsel requested that the sentencing court accept the parties' joint

recommendation that would release Slipko on his 25th birthday, specifically pointing to his youth:

> He's 15 at the time this offense occurs. The [c]ourt, in reviewing that, will find he's an immigrant with a single mother who was left to his own devices. He was subject to everything around him at the time. He wasn't going to school, and I understand that cuts both ways. He had a complete inability to appreciate the seriousness of what the consequences were going to be from his actions on January 28th.
>
> . . . .
>
> I know the [c]ourt's reviewed the mitigation [package]. [Slipko's] life touches on all of the things that the courts consider when sentencing under youthfulness components. Obviously[,] his age, his developmental maturity, his engagement in risk behavior, his inability to appreciate consequences, his poor impulse control, his educational deficiencies, his socioeconomic status, and obviously his lack of parental support. All of those things contribute to the child that's before this court, and that are all factors that the courts indicate this court should consider when imposing an appropriate sentence.

VRP (guilty plea and sentencing) at 30-31.

V. SENTENCING

> Prior to imposing its sentence, the sentencing court acknowledged the difficulty of the case,
>
> Okay. So[,] this is a terrible case from both sides. It's two families that were struggling with a lot of their own issues. People talk about drug use, and that there is a drug system that's being a victimless crime; that drugs should be legalized because there are not real victims when we talk about drugs. This is a prime example of how drugs lead to terrible consequences. These drug rip-off crimes are becoming more and more common, and, typically, they end up with somebody being shot and killed.

VRP (guilty plea and sentencing) at 34. The sentencing court also commented on the role that

parenting plays in these types of crimes, stating,

7

Sixteen-year-olds shouldn't be running around the street with guns. Seventeen-year-olds shouldn't be running around the streets with guns. As parents, we need to do better, and as difficult as it [is] to police your child, you need to be policing your child from both sides. Some families are ill-equipped to do that for their own issues, their own history of abuse, their being victims, not really understanding.

VRP (guilty plea and sentencing) at 34. The sentencing court then tied its general comments to Slipko's particular environment and familial circumstances, observing,

Certainly[,] in [Slipko's] family coming to America, having difficulties with language. All of those [unintended] consequences that happen when you're an immigrant family, and the environment and the neighborhood where [Slipko] was living. I believe the psychological evaluation talks about [Slipko's] brother having a fight to get out of the building to go play on the street.

VRP (guilty plea and sentencing) at 34.

Thereafter, the sentencing court addressed *Houston-Sconiers* and its application to Slipko.

The sentencing court stated,

But we have a situation where two young people, ill-equipped to deal with consequences, ill-equipped to understand the nature of their actions, and really to appreciate the consequences. In the *Houston-Sconiers* case, which is a case in our state, requires the [c]ourt to consider youthfulness, the ability to appreciate consequences, the adolescent brain development, the level of maturity, all of those things, and take that into consideration. A judge sentencing a youth is not bound by what are the standard sentence ranges. Their hands are basically free to impose any reasonable sentence that the law allows.

[Slipko] was the victim of a lot of violence in this family. He was the victim of himself being abused and witnessing abuse. And the impact of domestic violence on young children is significant. It does alter their brain chemistry. It sets them up for future drug use. It sets them up for school failure. It sets them up to becoming victims themselves and/or perpetrators of crime.

VRP (guilty plea and sentencing) at 36-37.

The sentencing court then found that there were substantial and compelling reasons to grant an exceptional sentence downward based on Slipko's youth. The sentencing court noted,

8

So I do find that there are substantial and compelling reasons to grant an exceptional sentence downward in this case based upon the age of [Slipko] at the time of the offense, the nature of the offense, his inability to appreciate the consequence of his acts. The fact that he had limited school success. The psychological evaluation indicates that he was performing below average [level] in terms of his intelligence. Although he's described to be a highly intelligent young man in terms of actual testing, that didn't come through in the testing, and that may be a product of the language barrier at various times in his life.

VRP (guilty plea and sentencing) at 38.

However, the sentencing court ultimately did not accept the parties joint sentencing recommendation that would release Slipko on his 25th birthday. The sentencing court stated,

But, on the other hand, I can't ignore that there was a murder that was committed here. I can't ignore the fact that two people were shot at. And if he were to be sentenced a straight-up adult offender, he would be looking at 360 months roughly plus the two consecutive counts of another 180 months with 15 years of flat time for the firearm enhancements.

I appreciate the work that went into this and the attempt at resolution. But as I said at the beginning, I'm not bound by an agreed sentence recommendation. I can't ignore the fact that [S.K.] lost his life, and two other people were shot at and could have been killed, and the baby could have been a victim of this as well.

VRP (guilty plea and sentencing) at 38-39.

The sentencing court still imposed an exceptional downward sentence, but imposed a total confinement of 216 months (18 years), including all enhancements running concurrently.[4] The sentencing court also imposed 36 months of community custody upon release.

The sentencing court summed up by stating,

There is a benefit to keeping [Slipko] in the juvenile system as long as possible, but I also think that for a murder conviction, first degree murder conviction along with the assault in the first degree conviction, sending a message that a nine-year sentence is appropriate is the wrong message. I just can't do that to other people

---

[4] The judgment and sentence imposed 193 months for each count of assault, but the sentencing court orally stated that it imposed 123 months on each assault count.

9

out there and other people that I will sentence in the future for similar type behaviors.

VRP (guilty plea and sentencing) at 39-40.  The sentencing court concluded by encouraging Slipko to take advantage of the educational programs and vocational training at the "Juvenile Rehabilitation Administration" (JRA) to reduce the likelihood of him returning to criminal behavior upon his release.

The sentencing court also reduced its sentencing decision to written findings of fact and conclusions of law.  The written document acknowledged that the sentencing court had considered all arguments from both parties and all written reports presented.  The written findings included the following:

> 4.  [T]he defendant's development maturity, his vulnerability to peer pressure, his inability to foresee the consequences of his actions, his self-regulation deficits, his poor impulse control, and overall brain development are further substantial and compelling reasons justifying an exceptional sentence, as recognized by higher [c]ourts.
>
> 5.  [J]ustice is best served by the imposition of an exceptional sentence based on the defendant's family and living situation at the time of the incident, his educational circumstances at the time of the incident, and his use of drugs around the time of the incident.
>
> . . . .
>
> 8.  Because of the presence of the above mitigating factors, and considering the purpose of the [SRA], and considering youthfulness and other factors identified by the reviewing [c]ourts, a sentence within the standard range is not [an] appropriate sentence.  An exceptional sentence below the standard range is appropriate.

CP at 55-56.

Slipko appeals his sentence.

ANALYSIS

Slipko appeals, making several arguments. First, Slipko argues the sentencing court failed to meaningfully consider the mitigating factors of youth when it imposed his exceptional mitigated sentence. Second, Slipko argues that the sentencing court did not sentence him commensurate with the culpability of a child when it presumptively applied the adult SRA standards. Third, Slipko claims that that the judgment and sentence erroneously included discretionary supervision fees, a DNA fee, and a VPA. And fourth, Slipko argues that we should remand to correct a scrivener's error in the judgment and sentence. Each argument will be addressed in turn.[5]

## I. YOUTH AS A MITIGATING FACTOR

Slipko argues that the sentencing court failed to meaningfully consider the mitigating factors of youth when it imposed his exceptional mitigated sentence. We disagree.

### A. LEGAL PRINCIPLES

"[C]hildren are different from adults" for sentencing purposes. *State v. Houston-Sconiers*, 188 Wn.2d 1, 18, 391 P.3d 409 (2017). Although the sentencing court has broad discretion to impose an appropriate sentence, it also must ensure that proper consideration is given to mitigating qualities of youth. *Id.* at 21; *see also In re Pers. Restraint of Forcha-Williams*, 200 Wn.2d 581, 596, 520 P.3d 939 (2022) (sentencing courts may exercise discretion to sentence below adult standard range based on juvenile's diminished culpability). We review sentencing decisions for an abuse of discretion. *State v. Delbosque*, 195 Wn.2d 106, 116, 456 P.3d 806 (2020).

---

[5] Slipko also argues that, if remanded, this case should be heard before a different judicial officer because the sentencing judge was biased. Whether or not there is any merit to Slipko's argument, it is moot. As Slipko concedes in his reply brief, the particular judicial officer has retired from the bench.

*Houston-Sconiers* requires sentencing courts to consider factors when sentencing any juvenile in adult court, including: (1) the mitigating circumstances of youth, including the juvenile's " 'immaturity, impetuosity, and failure to appreciate risks and consequences,' " (2) the juvenile's environment and family circumstances, (3) their participation in the crime and the possible effects of familial and peer pressure, (4) "how youth impacted any legal defense," and (5) "any factors suggesting that the child might be successfully rehabilitated." *Houston-Sconiers*, 188 Wn.2d at 23 (quoting *Miller v. Alabama*, 567 U.S. 460, 477, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)).

Meaningful consideration of the *Houston-Sconiers* factors requires courts to do more than merely recite the differences between juveniles and adults. *Delbosque*, 195 Wn.2d at 121. The court must meaningfully consider the differences between juveniles and adults, including " 'how those differences apply to the facts of the case.' " *Id.* (quoting *State v. Ramos*, 187 Wn.2d 420, 434-35, 387 P.3d 650 (2017)). Courts "must 'receive and consider relevant mitigation evidence bearing on the circumstances of the offense and the culpability of the offender . . . . ' " *Id.* (quoting *Ramos*, 187 Wn.2d at 443). This can include expert and lay testimony. *Id.*

Age does not automatically entitle every juvenile defendant to an exceptional downward sentence. *State v. Anderson*, 200 Wn.2d 266, 285, 516 P.3d 1213 (2022). The juvenile defendant has the burden of proving by a preponderance of the evidence that there are substantial and compelling reasons warranting an exceptional sentence below the standard range. *Ramos*, 187 Wn.2d at 434. A juvenile "must show that their immaturity, impetuosity, or failure to appreciate risks and consequences—characteristics of youth that suggest a juvenile offender may be less culpable than an adult offender—contributed to the commission of their crime." *Anderson,*

200 Wn.2d at 285. A sentencing court is not required to impose an exceptional sentence below the standard range if it considers the qualities of youth at sentencing and determines that a standard range is appropriate. *See Houston-Sconiers*, 188 Wn.2d at 21. And while the sentencing court must focus on the mitigating qualities of youth, they must bear in mind the facts of the particular case, including those that counsel in favor of punishment. *Anderson,* 200 Wn.2d at 286.

B. APPLICATION

Slipko argues that the sentencing court failed to meaningfully consider the mitigating factors of youth as applied to him and did not thoroughly explain its reasoning. Slipko further claims that the sentencing court imposed its sentence based on broad generalizations and personal opinions and decided to make an example out of Slipko. Slipko's claims are unpersuasive.

Here, the sentencing court spoke at length about the mitigating qualities of youth and Slipko's particular circumstances both at the declination hearing and, later that same day, at the sentencing hearing. The sentencing court considered and spoke about Slipko's mitigation package, his psychological evaluation, presentations from the parties and family members, and the joint sentencing recommendation.

All of the *Houston-Sconiers* factors were folded into the sentencing court's considerations. As to the first factor, the mitigating circumstances of youth, the sentencing court recognized that Slipko was not prepared to understand the nature of his actions and their consequences. The sentencing court noted that it was also required to consider adolescent brain development, the level of maturity, and "all of those things." VRP (guilty plea and sentencing) at 37. The sentencing court also stated that being a victim of, and witnessing, violence and abuse, alters a young child's brain chemistry.

As to the second factor, the juvenile's environment and family circumstances, the sentencing court discussed at length Slipko being a victim of violence in his family home and noted that young children who are victims of domestic violence are set up to become perpetrators of crime. The sentencing court also heard from Slipko's counsel who explained that Slipko was an immigrant, had a single mother who did not supervise him, and he did not attend school. And the sentencing court further recognized that these issues likely contributed to Slipko's limited success in school. The sentencing court said the evaluation showed that Slipko performed below average in testing (perhaps due to a language barrier) despite also describing him as a highly intelligent young man.

As to the third factor, the juvenile's participation in the crime and the effect of any family or peer pressures, the sentencing court discussed Slipko's participation in a drug rip-off crime that resulted in a murder and two additional people being shot at. Moreover, the sentencing court also found in its written findings that Slipko's vulnerability to peer pressure was one of several further substantial and compelling reasons justifying an exceptional sentence.

As to the fourth and fifth factors, how youth impacted any legal defense and any factors suggesting that the child might be rehabilitated, the sentencing court reviewed the mitigation package, including the psychological evaluation, and heard extensive evidence about Slipko and his potential for rehabilitation. For example, the psychologist's report noted that Slipko posed a "moderate-to-high risk of future violence" but that there were "good prospects of rehabilitation" in the juvenile justice system. CP at 308, 310. The State argued at the declination hearing that there was "some hope and optimism" for Slipko. VRP (declination hearing) at 17. Slipko, through his counsel, also expressed his regret for his actions and the pain and suffering he caused the

14

victim's family and wanted to take responsibility. And the sentencing court based, at least in part, its decision at the declination hearing on trying to maximize Slipko's development of skills that would help him "survive in the adult world." VRP (declination hearing) at 27. The sentencing court also directly tied Slipko's extensive exposure to family violence to an alteration of brain chemistry that could set him up for future failures with school, drug use, and being a future victim or perpetrator of crime. Finally, after imposing its sentence, the sentencing court also told Slipko that it hoped that he took advantage of the educational programs and vocational training while in the JRA to help avoid the possibility of him returning to criminal behaviors.

After considering the evidence relevant to the *Houston-Sconiers*' factors, the sentencing court agreed that an exceptional sentence downward was appropriate. As the sentencing court wrote in his written findings,

> [T]he defendant's development maturity, his vulnerability to peer pressure, his inability to foresee the consequences of his actions, his self-regulation deficits, his poor impulse control, and overall brain development are further substantial and compelling reasons justifying an exceptional sentence, as recognized by higher [c]ourts.

CP at 55. Nevertheless, the sentencing court rejected the joint recommendation of the parties, explaining that it could not ignore the fact that the victim lost his life and two other people were shot at and could have been killed.[6]

---

[6] The 216 month sentence imposed by the sentencing court was still significantly lower than the standard range of 606 to 742 months.

15

Still, Slipko challenges the sufficiency of the sentencing court's consideration of the *Houston-Sconiers* factors. He argues that the sentencing court engaged in mere generalizations of how domestic violence might potentially impact a child and did not evaluate Slipko's particular circumstances. He complains the sentencing court expressed its own personal opinion about the problematic nature of legalizing drugs, absent parents, and children having guns. Slipko contends that the sentencing court's generalizations and opinions had little to do with his circumstances and how they mitigated his culpability.

Slipko asks too much. Although it is true that the sentencing court made general observations about drugs and parenting, when reviewed as a whole, the sentencing court clearly considered how Slipko's youth may have impacted his criminal behavior. The sentencing court did more than recite the differences between juveniles and adults. *See Delbosque*, 195 Wn.2d at 121. Instead, by recounting the events of the evening, Slipko's history as a victim of domestic abuse and violence, his absent mother, his background as an immigrant with a potential language barrier, his limited school success, and facts gleaned from his psychologist's evaluation, the sentencing court tied the *Houston-Sconiers* factors to the circumstances of the crime and Slipko's life experiences.

Sentencing courts have absolute discretion to impose whatever sentence they deem appropriate so long as they meaningfully consider youth at sentencing. *Houston-Sconiers*, 188 Wn.2d at 9, 21, 23. Here, the end result from the sentencing court's consideration of Slipko's youth was an exceptional mitigated sentence, just not one requested by the parties. Although Slipko takes issue with the court's ruling, his criticisms ultimately go to the *decision* the court reached rather than the manner in which the court exercised its discretion. Even if we disagreed

with the sentencing court's decision ourselves, our inquiry on appeal is not whether we agree with the judgment of the sentencing court, but whether the sentencing court erred in exercising its discretion. Viewed as a whole, we conclude that the sentencing court met its obligation to meaningfully consider the mitigating qualities of youth and, thus, did not abuse its discretion when it imposed its exceptional sentence in this case.

II. PRESUMPTIVE APPLICATION OF JJA STANDARDS

Slipko next argues the sentencing court erred by presumptively applying the adult SRA standards because the SRA does not account for his diminished culpability and capacity for rehabilitation. He argues that article I, section 14 of our state constitution, and specifically, the prohibition against cruel punishment, categorically bars the presumptive application of adult sentencing standards to children whose crimes are mitigated by youth and that we should presumptively apply the JJA. Slipko contends that, instead of the SRA, the JJA should be presumptively applied because it recognizes a child's diminished culpability and gives children greater opportunities for redemption and rehabilitation than the criminal justice system does for adults.[7] We disagree.

Slipko's argument that the application of the SRA to juvenile offenders in adult court violates article I, section 14's prohibition against cruel punishment is unpersuasive. In the first place, courts sentencing juveniles in adult court are not bound by the SRA ranges in the same way

---

[7] The JJA provides completely different—and far lower—sentencing ranges than the SRA for offenders in juvenile court. RCW 13.40.0357. As observed by the dissenting opinion in *State v. Gregg*, "Our juvenile justice system . . . gives children far more opportunities for redemption and rehabilitation than our criminal justice system offers to adults." 196 Wn.2d 473, 486, 474 P.3d 539 (2020) (González, J., dissenting).

as when sentencing adults. Sentencing courts possess "absolute discretion to depart as far as they want below otherwise applicable SRA ranges and/or sentencing enhancements when sentencing juveniles in adult court, regardless of how the juvenile got there." *Houston-Sconiers*, 188 Wn.2d at 9. This discretion is actually broader than Slipko's requested result of presumptively applying the JJA. Said another way, adopting Slipko's argument would actually infringe upon the absolute discretion that *Houston-Sconiers* bestowed upon sentencing courts to depart as far as they want below the applicable SRA ranges when sentencing juveniles in adult court and youth is found to be a mitigating factor.

But more importantly, adopting Slipko's argument would require us to declare the SRA unconstitutional in a manner that exceeds the boundaries of current jurisprudence from our Supreme Court. Although children are different under the Eighth Amendment to the United States Constitution for sentencing purposes, no Washington case has held that using the SRA when sentencing juveniles in adult court violates our state constitution. Indeed, recent cases from our Supreme Court have carefully cabined the exceptions to the SRA in juvenile sentencing. For example, in *State v. Gregg*, our Supreme Court was asked to declare that juvenile sentencing must start with a general presumption that a mitigated sentence is required unless the State proves otherwise. 196 Wn.2d 473, 482, 474 P.3d 539 (2020). The *Gregg* Court rejected that invitation stating,

> Without explicitly stating as much, Gregg asks this court to rewrite the SRA and declare standard range sentences to be exceptional sentences when applied to juveniles. To reach this result, we would not only need to declare the SRA structure partially unconstitutional but we would also need to overrule some of our cases. We disagree with the arguments made by Gregg, and he has not shown that such relief is appropriate in this case.

*Id*. at 482-83. And in *State v. Anderson*, the court explained that article I, section 14's categorical bar on the imposition of life without parole or release sentences on juveniles whose crimes reflect youthful immaturity did not extend to a term-of-years sentence despite the imposition of a 61-year sentence in that case because, in part, judicial discretion provided the necessary protection against cruel punishments. 200 Wn.2d at 272, 283-84.[8]

Here, Slipko asks us to extend article I, section 14's invalidation of the SRA well beyond the lines drawn by our Supreme Court. Similar to the defendant in the *Gregg* case, Slipko essentially asks us to rewrite the SRA by having sentencing courts presumptively apply the JJA to juveniles being sentenced in adult court where youth has already been found to be a mitigating factor. Slipko provides no persuasive reason for us to take this unprecedented step in the face of our Supreme Court's recent decisions. *See Gregg,* 196 Wn.2d at 482-83; *Anderson,* 200 Wn.2d at 283-85; *see also 1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 590, 146 P.3d 423 (2006) (the court of appeals is bound to follow precedent established by our Supreme Court). This is especially true given that presumptive application of the JJA to offenders where youth is a mitigating factor is unnecessary—sentencing courts already have complete discretion in

---

[8] Slipko appears to urge the use of a categorical bar framework to evaluate his article I, section 14 argument. But he offers no analysis or explanation of how he proposes to apply that two-pronged framework. *See Gregg*, 196 Wn.2d at 481 (under the categorical bar analysis, "we first consider 'whether there is objective indicia of a national consensus against the sentencing practice at issue,' then the court applies its own independent judgment to determine whether the practice is unconstitutional based on precedent from our cases and the court's own understanding and interpretation of article I, section 14." (quoting *State v. Bassett*, 192 Wn.2d 67, 83, 428 P.3d 343 (2018))).

sentencing juveniles under *Houston-Sconiers* where youth is a mitigating factor.[9]  188 Wn.2d at 9.  Accordingly, we reject Slipko's request for an expansion of the current law.[10]  In sum, we hold that article I, section 14 does not require presumptive application of the JJA when sentencing juveniles in adult court.

III.  IMPOSITION OF LEGAL FINANCIAL OBLIGATIONS

Slipko argues that the judgment and sentence erroneously included discretionary supervision fees and those fees are no longer authorized by statute, and therefore, we should remand to strike these fees from his judgment and sentence.  He also argues in his reply brief that because of recent legislative changes, we should remand to strike the VPA and the DNA collection fee.

---

[9] Slipko takes issue with this broad discretion, contending that it leads to unfair results because such discretion is subject to the sentencing court's " 'imprecise and subjective judgments' " about a child's culpability.  Br. of Appellant at 41 (quoting *Bassett*, 192 Wn.2d at 89).  But Slipko fails to persuasively show that broad discretion, appropriately exercised, is meaningfully altered by any reference to the adult SRA standards by the sentencing court.

Indeed, we reject Slipko's suggestion that there is a *presumptive application* of the SRA when youth are sentenced in adult court.  The SRA standard sentencing ranges serve as a "starting point" for the sentencing of juveniles.  *Forcha-Williams*, 200 Wn.2d at 596.  But this is different than a "presumptive application" of the SRA ranges.  Br. of Appellant at 33.  As noted above, trial courts have full discretion to impose *any* sentence below the standard range if the offender has diminished culpability based on youth.  *Forcha-Williams*, 200 Wn.2d at 597; *Houston-Sconiers*, 188 Wn.2d at 21.  This could include a sentence crafted to be within the JJA sentencing ranges or even a sentence with no prison time at all.

[10] The State argues that Slipko waived the application of the JJA when he agreed to adult jurisdiction at the declination hearing, citing *State v. Saenz*, 175 Wn.2d 167, 174, 283 P.3d 1094 (2012) ("When a juvenile waives juvenile court jurisdiction he or she also waives the increased protections of the juvenile justice system, exiting a system designed to rehabilitate and entering a system designed to punish.").  Because we decide that article I, section 14 does not require presumptive application of the JJA as urged by Slipko, we do not address this argument.

The State concedes that the case should be remanded to strike the supervision fees. We accept the State's concession regarding the supervision fees and remand to the sentencing court to strike the fees related to community custody supervision from the judgment and sentence.

As for the DNA collection fee, until very recently, a court was required to impose such a collection fee unless the defendant's DNA was previously collected as a result of a prior conviction. Former RCW 43.43.7541 (2018). But in 2023, the legislature eliminated this requirement. LAWS OF 2023, ch. 449, § 4. And the court must waive any DNA collection previously imposed, on the defendant's motion. RCW 43.43.7541(2). Like the community custody supervision fees, we remand to the sentencing court to strike the DNA collection fee from the judgment and sentence.

Recent legislative changes have also affected the VPA. Previously, the law imposed a VPA of $500 on any person found convicted of one or more convictions of a felony or gross misdemeanor in the superior court. Former RCW 7.68.035 (2018). But in the 2023 session, the legislature changed the law to prohibit the imposition of the VPA on indigent defendants. LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(4). The new law also requires trial courts to waive any VPA imposed *prior to* the effective date of the amendment if the offender is indigent, on the offender's motion. LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(5)(b). Indigency, in the context of the VPA, is defined by RCW 10.01.160(3). This change took effect on July 1, 2023, but applies to Slipko because his appeal was pending at the time. LAWS OF 2023, ch. 449; *State v. Ellis*, __ Wn. App. 2d __, 530 P.3d 1048, 1057-58 (2023) (the legislature's VPA amendment applied to the defendant because the case was still on direct appeal).

The sentencing court mentioned Slipko's indigency at the sentencing hearing when it stated it was imposing "[n]o other costs [beyond the VPA and DNA collection fee] as he's indigent." VRP (guilty plea and sentencing) at 42. However, because it is unclear whether the sentencing court found Slipko indigent as defined in RCW 10.01.160(3), we remand for the sentencing court to make this determination and to reconsider imposition of the VPA.

IV. SCRIVENER'S ERROR

Slipko argues that we should remand to correct a scrivener's error in the judgment and sentence. At sentencing, the court orally ordered Slipko to serve 123 months for each assault count, concurrent with the term of incarceration for the murder count. However, the judgment and sentence imposed 193 months for each count of assault. The State concedes the error and agrees that remand is appropriate. We accept the State's concession and remand to correct the scrivener's error.

CONCLUSION

We affirm the trial court's exceptional sentence. However, we remand to strike the discretionary supervision fees, the DNA collection fee, and to correct the scrivener's error in the judgment and sentence. We also remand for the superior court to determine Slipko's indigency and, following this determination, reconsider the imposition of the VPA.

No. 56529-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

GLASGOW, C.J.

MAXA, J.

23